33 A.3d 1024

**Daniel Joseph PAIR**

v.

**STATE of Maryland.**

No. 1396, Sept. Term, 2010.

Court of Special Appeals of Maryland.

Dec. 22, 2011.

618

620

Brian M. Saccenti (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for Appellant.

Mary Ann Ince (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: JAMES R. EYLER, WATTS and CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

MOYLAN, J.

The compelled merger of convictions to avoid multiple punishments for the same offense, or perhaps for the same criminal behavior, is by no means as simple a subject as it

might at first appear to be. The hydra has no less than three heads: 1) constitutional double jeopardy; 2) the rule of lenity as an aid to statutory construction; and 3) the essentially tetherless notion of fundamental fairness. These are no mere variations on a common theme. They are the subjects for widely differing inquiries. Fundamental fairness, especially, remains very much an enigma. All three are now before us.

The appellant, Daniel Joseph Pair, filed in the Circuit Court for Baltimore County on July 2, 2010, a Motion to Correct an Illegal Sentence pursuant to Maryland Rule of Procedure 4–345(a). The posited illegality was that three sentences had not been merged. On July 14, 2010, Judge Dana M. Levitz denied the motion. This appeal followed.

### The Original Trial

The appellant was originally convicted by a Baltimore County jury, presided over by Judge Levitz, of 1) first-degree assault, 2) robbery, 3) false imprisonment, and 4) the unlawful taking of a motor vehicle. The victim of all of the crimes was the appellant's former fiancé, Allison Gilbert. Judge Levitz sentenced the appellant to a term of 25 years imprisonment for the first-degree assault, a consecutive term of 10 years for the robbery, a consecutive term of 5 years for the false imprisonment, and a concurrent term of 5 years for the unlawful taking of a motor vehicle.

### The First Appeal

The appellant appealed his convictions to this Court, raising four separate contentions including the sufficiency of the evidence to support the convictions. One of the appellant's other contentions was that the conviction for the unlawful taking of a motor vehicle should have merged into the conviction for robbery, because the motor vehicle was one of several items of property taken in the course of the robbery.

In the case of *Pair v. State*, No. 2119, September Term, 2006, filed on July 28, 2009, this Court agreed with the appellant as to the merger of the conviction for the unauthorized taking of a motor vehicle. In all other respects, the 41–

page unpublished opinion by Judge Meredith affirmed the judgments of conviction.

Because the issue of merger is again being raised by the appellant, it is important to note precisely why this Court ruled as it did with respect to the merger of the motor vehicle theft charge. The rationale for merging theft into robbery has no bearing on the new merger issues now before us. After noting that "[t]he legislature set forth its intent regarding the merger of motor vehicle theft into theft," Judge Meredith's opinion went on to explain why theft generally is deemed to merge into the greater inclusive robbery, which is, by definition, a compound theft.

Appellant is correct that the appellate courts of this State have held that under the rule of lenity, theft and robbery merge. *See Spitzinger v. State,* 340 Md. 114, 124–25 [665 A.2d 685] (1995) ("We ... have some doubts, in light of our prior cases and the history of common law robbery and common law larceny, as to whether the legislature intended to authorize successive or cumulative punishment for felony theft and robbery. Those doubts must be resolved in favor of the defendant, so that under the rule of lenity the sentences for robbery and felony theft should merge."); *Bellamy v. State,* 119 Md.App. 296, 307 [705 A.2d 10] (1998) (relying on *Spitzinger* to conclude that convictions of felony theft and robbery with a deadly weapon arising out of a single event or incident should merge under the rule of lenity).

### The Motion to Correct an Illegal Sentence

In his Rule 4–345(a) motion before Judge Levitz, the appellant pushed for additional mergers. Having failed before Judge Levitz, the appellant now pushes the same contentions before us:

1.  The first-degree assault conviction merges into the robbery conviction;

2.  Alternatively, the first-degree assault conviction merges into the false imprisonment conviction; and

3. False imprisonment and robbery merge under the Rule of Lenity and the principle of fundamental fairness.

## Rule 4–345 and Merger

■ We are chagrined that the appellant, who successfully brought one merger issue before this Court in his first appeal, now raises three additional merger issues for the first time, thus necessitating a second trip to the circuit court and a second trip to this Court when a single trip would fully have served the same purpose.[1] Notwithstanding our chagrin, however, Maryland Rule 4–345 expressly permits such fragmentation under certain circumstances. A failure to merge a sentence is considered to be an "illegal sentence" within the contemplation of the rule. *Britton v. State,* 201 Md.App. 589, 30 A.3d 236 (2011); *Ingram v. State,* 179 Md.App. 485, 508–09, 947 A.2d 74 (2008); *Campbell v. State,* 65 Md.App. 498, 510–11, 501 A.2d 111 (1985); *Randall Book Corp. v. State,* 316 Md. 315, 319–22, 558 A.2d 715 (1989). The coverage of Rule 4–345, however, is not totally free of ambiguity.

Rule 4–345's exemption from the normal preservation requirements and the normal filing deadline is based upon the inherent "illegality" of the sentence enjoying open-ended and timeless review. In *Britton v. State, supra,* Chief Judge Krauser highlighted the significance of actual "illegality:"

> [W]hen the trial court is required to merge convictions for sentencing purposes but, instead, imposes a separate sentence for each unmerged conviction, it commits reversible error. ... *[S]uch an error implicates the illegality of imposing "multiple sentences ... for the same offense." ... [T]he result is the imposition of a sentence "not permitted by law."*

(Emphasis supplied).

We are dealing in this case not with one merger issue but with three distinct merger issues. It is conceivable that Rule

---

1. The appellant similarly failed to raise these merger issues in his Motion for a New Trial before Judge Levitz on November 22, 2006, and at his subsequent hearing before a Sentence Review Panel.

4–345(a) might confer its special dispensation upon two of those merger issues but not upon the third. When a sentencing judge fails to merge multiple convictions for the "same offense" pursuant to the required evidence test of *Blockburger v. United States,* the unmerged sentence is unconstitutional, as a matter of law. That constitutes an "illegal sentence" within the contemplation of Rule 4–345(a). When a sentencing judge imposes multiple sentences where it is established, as a matter of law, that the Legislature intended that multiple sentences not be imposed, that legislatively prohibited sentence is also an "illegal sentence" within the contemplation of Rule 4–345(a). Both a violation of the Double Jeopardy Clause and a violation of the rule of lenity are matters that are decided as a matter of law.

By contrast, the newest and thus far little explored addition to the ranks of merger issues, to wit merger pursuant to fundamental fairness, may be a phenomenon with a critical difference. Such a merger decision would appear to be something that might frequently be heavily fact-driven and dependent on the particular circumstances of the particular case. This would seem to be the type of thing requiring a judgment call by the trial judge, the umpire on the field, with an immediate sense of the pulse of a trial. By its very nature, this could be a discretionary call and not something that can be reduced to legal algebra and decided as a matter of law. Could a failure to merge in such a discretionary context be said to be an inherently "illegal sentence?" If not, it would not qualify for Rule 4–345(a)'s procedural dispensations.

We are already far enough along in our present discussion, however, to assume, purely *arguendo,* that Rule 4–345(a) covers the merger arguments presently before us. At least we will make that assumption with respect to the first two merger issues. Whether merger by virtue of fundamental fairness enjoys Rule 4–345(a)'s procedural dispensation is far more problematic.

### The Many Faces of Assault

Assault is a protean crime. It frequently is a significant and autonomous crime in its own right. In this case, the first-

degree assault charge was the flagship count of this entire prosecution. The first-degree assault charge, for instance, carried the greatest maximum penalty of the three crimes for which the appellant was convicted. It was for the first-degree assault that Judge Levitz imposed the harshest penalty. Assault, on the other hand, can sometimes be simply nothing more than a constituent element in a crime such as robbery.

The question of whether a particular crime, such as the first-degree assault in the present case, is the centerpiece of the prosecution or a mere incident of some other crime is intensely fact-specific. There is no automatic or mechanistic answer as a matter of law. The answer, rather, depends upon the particular facts and circumstances of each individual case and can readily go in either direction.

*Lamb v. State*, 93 Md.App. 422, 613 A.2d 402 (1992) is illustrative. The issue in *Lamb* was whether the conviction for assault should have merged into the conviction for false imprisonment. Assault, of course, is one of the elements of false imprisonment. An assault that serves that instrumental function and nothing more is, therefore, a lesser included offense within the greater inclusive offense of false imprisonment. The two are the "same offense." In the *Lamb* case, however, the assault did not serve that merely ancillary function and do nothing more. It did a great deal more. It was, indeed, the flagship or centerpiece of the entire prosecution, as it is in the case now before us. This Court explained the various characteristics that may give a particular crime on a particular occasion such celebrity status:

> *Every aspect of this trial*—the evidence, the jury arguments, the judge's instructions, the presentence arguments, the judge's explanation of the sentences, the sentences themselves—*combine to make it indisputably clear that the major crime for which the appellant was convicted was his deliberate placing of Sharon Herz in fear of losing her life.* The jury instructions focused upon and highlighted the assault charge. . . .

*The assault received the ten-year sentence, beside which the breaking and entering, the actual battery and the false imprisonment all paled into relative insignificance,* as was apparent throughout the trial. *The assault* under the fifth count *was obviously no mere instrumentality in bringing about an unlawful confinement. It was rather the case that the false imprisonment was a mere incident of it.*

93 Md.App. at 473–74, 613 A.2d 402 (emphasis supplied).

Under certain circumstances, a particular assault might be nothing more than a lesser included offense with the greater inclusive offense of kidnapping. In *Hunt v. State,* 12 Md.App. 286, 310, 278 A.2d 637 (1971), however, Judge Orth explained how the assault in that case enjoyed an autonomous and non-merging status of its own:

But here *there was evidence from which the jury could have found that Hunt assaulted Barbara independent of any assault incident to the kidnapping itself.* Barbara testified that while in Hunt's apartment he was importuning her to have sexual relations with him. "I told him to leave me alone, to get away from me and I was pushing him and he was pushing me and he struck me." He grabbed her arm and pulled her in the bedroom and threw her down on the bed. *These acts of assault and battery were not an element of the kidnapping but a separate and distinct offense.* We hold that there was no merger of the [assault] into the convictions under the [kidnapping] counts.

(Emphasis supplied).

In *Britton v. State,* 201 Md.App. 589, 30 A.3d 236 (2011), the appellant argued that, for sentencing purposes, his assault conviction should have merged into his conviction for resisting arrest. Chief Judge Krauser, albeit recognizing that sometimes an assault is simply an element of resisting arrest, explained why the more significant assault in that case enjoyed a non-merging vitality of its own:

*[A]ppellant assaulted Officer Moreau with his car in an act that was completely separate from his acts of assaulting the officers with his fists and feet in the brawl that ensued*

*several minutes later. Moreover, it appears that the ramming of Officer Moreau's car was a gratuitous act and not part of appellant's resisting arrest, as the officer was not in active pursuit of appellant when that act occurred.*

. . . .

Thus, the *offense of assaulting* Officer Moreau *and the offense of resisting arrest were based on distinct acts,* separated by time and geography, and *merger of the convictions is not required.*

(Emphasis supplied).

Whether the assault in this case is the star performer of our drama or a mere supporting actor is a fact-driven inquiry. That is why all the lurid circumstances of this case are so vitally important. Judge Meredith's opinion sets them out meticulously.

### The Prior Relationship

For merger purposes, it is critical that we determine whether the assault was a mere incident of robbery or whether it had a life and an energizing purpose of its own. It is necessary, therefore, that we understand the turbulent relationship between the assailant and the assault victim. In that regard, Judge Meredith's opinion explained:

Allison Gilbert testified that *appellant had been her fiancé* and that she had met him during the summer of 2004 at The Harem, an entertainment club located on The Block in Baltimore City. Gilbert stated that she "[d]anced" at the club under the stage name of S'more, and appellant was "a doorman/floorman." She stated that their relationship began as a friendship, but that two or three weeks later, they began a romantic relationship and stopped seeing others. During that time, Gilbert was renting an apartment in Essex, which she leased in her name. Gilbert recalled that about six to eight months into their relationship, *appellant asked her to marry him, and they became engaged.* Gilbert stated that eventually, their relationship began to change

with appellant becoming "more irritable"; they fought more, and began "arguing about stupid stuff."

On August 22, 2005, Gilbert found out that she was three months pregnant with twins. Also on August 22, appellant took Gilbert's Dodge Neon 2000, but returned to the apartment sometime during the night. When Gilbert got up that morning, however, appellant was not in the apartment. Gilbert testified that she called appellant, and he told her "to take a cab to work to pick up [her] car." Appellant had twice before taken the car without her knowledge.

(Emphasis supplied).

## The Relationship Deteriorated

The opinion went on to describe the early evening of August 22, 2005, and how the ill-feeling between the appellant and Allison Gilbert reached critical mass as Ms. Gilbert arrived home.

By this date, Gilbert and appellant had begun working at another "club" owned by the owners of The Harem. This club was called The Golden Nugget. *Gilbert* took a cab to the club that evening and *"found some girl's stuffed animal and panties in the back of the car"* so she told appellant *that their relationship was over.* She also told appellant that she was returning to the apartment and would pack up appellant's belongings. Gilbert informed appellant that she "was putting his stuff outside." Gilbert recalled that *appellant became "mad" and that they had a physical altercation at the club.* They were in the locker room and two girls ran out to get Steve, the club's owner, who came into the locker room and "pulled [appellant] off and held him[.]" Gilbert believed that Steve was taking appellant to the office, and she asked Steve to delay appellant so that she "could put his stuff out before he got to the house."

*Gilbert* stated that she *went to her car and drove home.* On the way, she called her father and told him what had happened. She called the police "so that they could be there in case he [appellant] was there already." She also called maintenance to change the locks to her apartment.

It took her approximately half an hour to drive to her apartment. She arrived there at about 9:00 p.m., and she began packing appellant's belongings. The maintenance workers soon showed up to change the locks. The police were also there, but about ten minutes after Gilbert began packing, the police informed her that unless she knew that she was "in grave danger" they could not remain, and they left.

After the locks were changed, Gilbert started to clean her apartment and moved her car to a different part of the parking lot. She then noticed that there was something wrong with the door to her apartment and again called maintenance. She was told that the maintenance worker could be paged and come out to her apartment again that evening. *Shortly thereafter, Gilbert heard a knock on her door.* By this point, Gilbert was done cleaning and she "had turned out all the lights so nobody would think [she] was home."

(Emphasis supplied).

### The Attack Began

The arrival of the appellant at Ms. Gilbert's apartment and the triggering of the assault occurred in the neighborhood of ten P.M. Our opinion continued:

Gilbert testified that the person at the door identified himself as "maintenance" so *she opened the door. Appellant was there,* and although Gilbert tried to brace her foot against the door, *appellant pushed the door open.* Appellant broke Gilbert's cell phone when he walked in the door. Gilbert stated that appellant looked through the apartment. Gilbert testified that she told him that he did not need to look through the apartment because all his possessions were "right there[ ]" and "all packed up in bags[,]" that is, in luggage and garbage bags. The items were located right inside the door to the apartment.

*After appellant looked through the apartment, he began hitting Gilbert with his fists. Gilbert stated that appellant hit her in her "[f]ace and everywhere[,]" but that he struck*

*her "[m]ostly" on her head.* Gilbert attempted to fight back and ended up on the floor. She recalled that *appellant then had his arm around her neck.* She heard knocking on her door, and appellant lifted her up, went toward the door, opened the door, and "this girl" that Gilbert knew from work was there. (Courtney Jones later testified, pursuant to a plea bargain, that she was the girl who joined appellant at Gilbert's apartment.).

Gilbert testified that, as soon *as the door was opened, the person at the door punched her. The girl entered the apartment, and she and appellant took turns holding and beating Gilbert.* Appellant and the girl were also verbally abusive.

Gilbert testified: *"They started hitting me more and then he [appellant] pulled out a knife and started chopping off all my hair, calling me a bald, dumb bitch."* The girl continued to hold Gilbert. *Appellant also tried to cut Gilbert's face and throat, but the knife was too dull.* Gilbert stated that appellant gave the knife to the girl.

(Emphasis supplied).

## The Attack Escalated

At a certain point, the two assailants tied a cord around Ms. Gilbert's neck. The tying-up of the victim may have engaged the gears of the false imprisonment charge, but it is transparently clear that the continuing assault was no mere incident of false imprisonment. It was a perverse, deliberate, and vengeful infliction of humiliation and degradation. Judge Meredith recounted this aspect of the unrelenting punishment, in its multiple manifestations:

The girl cut the cord to the vacuum cleaner and *they then used that cord to tie Gilbert up.* Gilbert stated that they used the cord to "hogtie" her "with a noose around [her] neck." She stated that they looped the cord around her neck three times and that if she moved her head too much, she would choke herself because the cord would tighten. Gilbert tried to free herself, but was unable to do so. In addition, she "was having a panic attack and couldn't

breathe the whole time." *They also put a dirty sock in her mouth.*

Gilbert stated that after she was tied up, *appellant and the girl discussed having sex on top of Gilbert before jumping on her stomach to kill the baby. At some point, they jumped on Gilbert's stomach* and appellant "was asking me why wouldn't I die yet."

Gilbert stated that *the girl gave appellant oral sex and then* "spit it in my face." Gilbert was still on the couch. She testified: *"Then they started having sex on top of me." While they had intercourse, the cord pulled on Gilbert's neck.*

(Emphasis supplied). We note now for later reference that the tying-up of the victim occurred long before the last minute thought of a robbery popped into anyone's head.

Gilbert testified to what occurred after appellant and the accomplice got off her:

*He* [appellant] went into the kitchen and *started pouring all the juice and water and everything that was cold on me, then poured Tide in my eyes and took the dirty cat litter box, put that on me,* started throwing random objects, like vases and stuff that was on, around the living room on me. *Then they were talking about either killing me or leaving without killing me.*

(Emphasis supplied).

### Robbery As An Afterthought

As the fury of the assault wound down and the assailants prepared to call it a night, the "11th hour" robbery was little more than an opportunistic afterthought. Our opinion went on:

*Gilbert told appellant where her rent money was and the keys to her car, and he took Gilbert's laptop computer.* Gilbert did not give appellant permission to take these items. She only told him where certain items were because they had been beating her, and she was tied up. After

appellant and the girl took Gilbert's possessions, they looked through her purse then left.

(Emphasis supplied). As the totality of the evidence made very apparent, the assault was the dog wagging the tail of robbery and not vice-versa.

## An Assaultive Marathon

Our opinion described how Ms. Gilbert freed herself and also recounted her testimony about the duration of the assault.

After appellant and the girl left, *Gilbert was able to free one foot from the cord, which she estimated took her twenty minutes to accomplish.* She was then able to get to the door, open the door, then screamed and knocked on doors until one of her neighbor's heard her and called the police. The neighbor then looked for scissors to free her from the cord. *Gilbert estimated that the entire incident with appellant and the girl lasted "two or three hours."*

(Emphasis supplied). A three-hour assault was self-evidently no mere incident of a ten-minute robbery.

## The Impact on the Victim

Both a neighbor and a responding police officer described the state of the victim in the immediate aftermath of her ordeal.

Travis Williams testified that he lived in the same apartment building as Gilbert. He was asleep in his apartment during the early morning hours of August 23, 2005, when his girlfriend woke him after she had heard a knock on the door. Williams then heard "a small knock at the door[,]" got up, looked through the peephole, and saw what he thought "was an old lady crying[.]" *Upon opening the door, Williams found "a girl, tied up in an extension cord or cable, cable rope, face was bruised and hair was cut off[.]"* Williams had his girlfriend call the police and he cut the cord from around the girl's neck and wrists. *Williams*

*added that the girl was "bruised and battered.... She was in bad shape."* The police soon arrived.

(Emphasis supplied).

Police Officer Andrew Callahan testified that he responded to the scene at 3:14 a.m., and found the victim

lying in the upper foyer area with her hands still tied around her back. The electric cord which she was tied with was still around her ankles and her wrist. *She appeared to be severely beaten, face was severely swelled. She also had like chunks of her hair coming out, very, very upset, very hysterical.*

(Emphasis supplied). The false imprisonment and the robbery were the least of Allison Gilbert's woes. She did not lose the baby.

### The Flagship Offense of First–Degree Assault

The dominant criminal offense perpetrated on Allison Gilbert by the appellant and his accomplice was a vicious and sadistic assault (actually, a continuing series of varied assaults) over a period of almost three hours. It was an assault, moreover, aggravated for sentencing purposes up to the first degree. In one of his contentions, the appellant argues that the sentence for first-degree assault should have merged into the sentence for robbery. In a second contention, the appellant argues that, alternatively, the sentence for first-degree assault should have merged into that for false imprisonment.

Because first-degree assault is at the core of the appellant's arguments, it behooves us to look closely at its elements and its dimensions. The legislative recognition of an aggravated variety of common law assault, thereafter labeled as first-degree assault, was first made by Section 3 of Ch. 632 of the Acts of 1996. It is now codified in Maryland Code, Criminal Law Article, § 3–202 and it reads as follows:

(a) *Prohibited.—*...

(1) A person may not intentionally cause or attempt to cause serious physical injury to another.

(2) A person may not commit an assault with a firearm, including:

(i) a handgun, antique firearm, rifle, shotgun, short-barreled shotgun, or short-barreled rifle, as those terms are defined in § 4–201 of this article;

(ii) an assault pistol, as defined in § 4–301 of this article;

(iii) a machine gun, as defined in § 4–401 of this article; and

(iv) a regulated firearm, as defined in § 5–101 of the Public Safety Article.

(b) *Penalty.*—A person who violates this section is guilty of the felony of assault in the first degree and on conviction is subject to imprisonment not exceeding 25 years.

In *Manigault v. State,* 61 Md.App. 271, 284 n. 2, 486 A.2d 240 (1985), when dealing with the at-times troubled relationship between the misdemeanor of common law assault and what was then the statutory felony of assault with intent to murder, rape, or rob (then codified as Art. 27, § 12), this Court actually anticipated the 1996 splitting of assault into degrees:

> It might facilitate our ability to conceptualize the relationship if we thought of common law assault as "assault in the second degree" and of the various aggravated assaults as forms of "assault in the first degree."

As is readily apparent, there are two alternative modalities for aggravating an ordinary second-degree assault upward to the first degree. The first is when the assailant "intentionally cause[s] or attempt[s] to cause serious physical injury to another." It is a specific-intent crime. The second aggravating modality is concerned exclusively with the *actus reus* of the assault having been committed "with a firearm."

Simply to clear away some of the clutter, we are dealing in this case only with the first variety of aggravation and not with the second. No firearm was involved. We are concerned only with the aggravating element of intentionally inflicting "serious physical injury" on the victim. What Judge William

Adkins said in *Nightingale v. State,* 312 Md. 699, 705, 542 A.2d 373 (1988), with respect to a multi-purpose criminal statute is equally apposite to a criminal statute that sets out alternative modalities of aggravating a crime upward to a higher degree of blameworthiness:

> When a multi-purpose criminal statute is involved, we refine it by looking at the alternative elements relevant to the case at hand.

### Double Jeopardy and Merger

■ One of the twin evils traditionally guarded against by the prohibition against double jeopardy, pursuant to either the Double Jeopardy Clause of the federal Fifth Amendment or to the common law of Maryland, is that of multiple punishment for the "same offense." The necessary inquiry is that of whether separate punishments are being imposed for the "same offense." In *Monoker v. State,* 321 Md. 214, 219–20, 582 A.2d 525 (1990), Judge Cole set out the required examination:

> *The required evidence test focuses on the elements of each crime in an effort to determine whether all the elements of one crime are necessarily in evidence to support a finding of the other, such that the first is subsumed as a lesser included offense of the second.* We summarized the test as follows:

>> The required evidence is that which is minimally necessary to secure a conviction for each ... offense. *If each offense requires proof of a fact which the other does not,* or in other words, *if each offense contains an element which the other does not, the offenses are not the same for double jeopardy purposes,* even though arising from the same conduct or episode. But, *where* only one offense requires proof of an additional fact, so *that all elements of one offense are present in the other, the offenses are deemed to be the same for double jeopardy purposes.* And of course if both [offenses] have exactly the same elements, the offenses are also the same within the meaning of the prohibition against double jeopardy.

(Emphasis supplied). *See also Brooks v. State,* 284 Md. 416, 419–23, 397 A.2d 596 (1979); *Whack v. State,* 288 Md. 137, 141–42, 416 A.2d 265 (1980); *State v. Boozer,* 304 Md. 98, 497 A.2d 1129 (1985); *Nightingale v. State,* 312 Md. at 702–08, 542 A.2d 373; *State v. Ferrell,* 313 Md. 291, 295–301, 545 A.2d 653 (1988); *Williams v. State,* 323 Md. 312, 316–320, 593 A.2d 671 (1991); *Campbell v. State,* 65 Md.App. 498, 511–12, 501 A.2d 111 (1985); *Gerald v. State,* 137 Md.App. 295, 311–13, 768 A.2d 140 (2001).

What is dispositive for the double jeopardy inquiry is that the crimes for which the appellant was sentenced in this case—first-degree assault, robbery, and false imprisonment—are not the "same offense." The first-degree assault requires the infliction or attempted infliction of serious bodily injury. The other two crimes do not. Robbery requires the theft of property. The other two crimes do not. False imprisonment requires the actual detention of the victim. The other two crimes do not. In this case, no merger was required by virtue of double jeopardy law.

### The Rule of Lenity and Merger

Merger based on the rule of lenity, by contrast, is a different creature entirely. Even when the merger of sentences is not compelled by the "required evidence" test of *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932), it may nonetheless be compelled by the rule of lenity. As Judge Eldridge explained in *State v. Jenkins,* 307 Md. 501, 518, 515 A.2d 465 (1986):

> Nevertheless, we have recognized on several occasions *that the required evidence test, while the normal standard, is not the exclusive standard for determining merger of offenses.* As stated in *Brooks v. State, supra,* 284 Md. at 423–424 [397 A.2d 596],
>
> > "even though offenses may be separate and distinct under the required evidence test, *courts occasionally find as a matter of statutory interpretation that the Legislature did not intend,* under the circumstances involved, *that a*

*person could be convicted of two particular offenses grow-*
*ing out of the same act or transaction."*

(Emphasis supplied). *See also Cousins v. State,* 277 Md. 383,
397, 354 A.2d 825 (1976); *Whack v. State,* 288 Md. at 142–45,
416 A.2d 265; *State v. Boozer,* 304 Md. 98, 104, 497 A.2d 1129
(1985); *White v. State,* 318 Md. 740, 744–46, 569 A.2d 1271
(1990); *Williams v. State,* 323 Md. at 321, 593 A.2d 671;
*Claggett v. State,* 108 Md.App. 32, 51–53, 670 A.2d 1002 (1996);
*Marquardt v. State,* 164 Md.App. 95, 149–52, 882 A.2d 900
(2005).

In *Walker v. State,* 53 Md.App. 171, 201, 452 A.2d 1234
(1982), this Court explained:

> If the Legislature intended two crimes arising out of a
> single act to be punished separately, we defer to that
> legislated choice.... If the Legislature intended but a
> single punishment, we defer to that legislated choice. If we
> are uncertain as to what the Legislature intended, we turn
> to the so-called 'Rule of Lenity' by which we give the
> defendant the benefit of the doubt.

The rule of lenity, however, deals only with legisla-
tive intent and, therefore, only with the situation wherein at
least one of the two crimes subject to merger analysis is a
statutory offense. *Khalifa v. State,* 382 Md. 400, 434, 855 A.2d
1175 (2004) ("As it is a principle of statutory construction, the
rule of lenity applies where both offenses are statutory in
nature or where one offense is statutory and the other is a
derivative of common law."). As Judge Smith pointed out for
the Court of Appeals in *Dillsworth v. State,* 308 Md. 354, 364,
519 A.2d 1269 (1987):

> The doctrine of merger by legislative intent operates as *a*
> *rule of statutory construction* and is not constitutionally
> mandated.

(Emphasis supplied). *See White v. State,* 318 Md. at 746, 569
A.2d 1271 ("Obviously a rule of statutory construction has
little relevance to an offense not created by Maryland stat-
ute."); *Marquardt v. State,* 164 Md.App. at 150, 882 A.2d 900
("As it is a principle of statutory construction, the rule of

lenity applies where both offenses are statutory in nature or where one offense is statutory and the other is derivative of common law.").

In *Monoker*, 321 Md. at 223, 582 A.2d 525, Judge Cole was very emphatic about the limited utility of the rule of lenity:

> *The rule of lenity,* formulated as an aid to statutory construction, *applies to statutory offenses.* In *White,* we applied the rule where one offense was statutory and the other common law. Solicitation and conspiracy are both common law offenses. *We have never applied the rule of lenity to two common law crimes, nor do we so extend the scope of that rule here.*

(Emphasis supplied).

Far and away, the most probing examination of the rule of lenity was that engaged in for this Court by Judge William Adkins in *Johnson v. State,* 56 Md.App. 205, 212–16, 467 A.2d 544 (1983), *cert. denied,* 299 Md. 136, 472 A.2d 999 (1984). Judge Adkins very perspicaciously pointed out that an inquiry into legislative intent is not only meaningless when at least one statute is not involved but is also meaningless when two statutes were enacted years apart and were not focused on the same subject matter.

> A common thread connects all the cases we have just discussed. It is the assumption (often not articulated) that *under the circumstances of a given case, it is reasonable to believe that the legislature that enacted a particular statute or statutes would express some intent as to multiple punishment.* That assumption is appropriate when a single act is charged as multiple offenses under a single statute (*Ladner, Bell* and *Prince* ), where the subject of two statutes is of necessity closely intertwined (*Loscomb* and *Fields* ), where one offense is necessarily the overt act of a statutory offense (*Walker* ), and where one statute, by its very nature, affects other offenses because it is designed to effect multiple punishment (*Whack* ). *Under those circumstances, it is not unreasonable to assume that the legislative body contemplated the possibility of multiple punishment and to*

*conclude that unless the intention in favor of multiple punishment is clear, as in Whack, the Rule of Lenity or its equivalent should be applied against the imposition of multiple punishment. But that thread is not present in the case at bar.*

*What is now Art. 27, § 12 (assault with intent to murder) was enacted* by Ch. 138, *Laws of 1809,* as part of an early codification of Maryland criminal law. *That codification did not include the offense of attempted robbery with a dangerous or deadly weapon* (now Art. 27, § 488) *which did not become part of our statutory law until* enacted by Ch. 457, Acts of *1927. Not only were these two statutory offenses created 118 years apart but there is no evidence that the legislature ever considered one when amending the other, nor was there reason for it to do so.* An assault with intent to murder may be and often is committed under circumstances showing no intent to rob; attempted armed robbery may be and often is committed under circumstances not involving the intent to kill. One offense is not necessarily the overt act of the other. And the punishment provided for each offense implicates no necessary likelihood of multiple punishment with respect to the other offense, since, unlike the handgun use law, the commission of one of these two offenses is not an essential predicate to the commission of the other.

56 Md.App. at 215–16, 467 A.2d 544 (emphasis supplied).

Speaking through Judge Smith, the Court of Appeals placed its express imprimatur on the *Johnson* analysis in *Dillsworth v. State,* 308 Md. 354, 366–67, 519 A.2d 1269 (1987):

*If the analytical framework enunciated in Johnson is applied to the case at bar, it quickly becomes apparent that this is not a proper case for invoking the doctrine of merger by legislative intent.* The prohibition against an *assault with intent to maim,* disfigure or disable was *enacted* by ch. 99 of the *Acts of 1853.* Code (1957, 1982 Repl.Vol.) Art. 27, § 386. Article 27, §§ 461 *et seq., the sexual offense legislation, was enacted in 1976, 123 years later ... there is no indication that the General Assembly considered the ques-*

*tion of multiple punishment* in those instances where a consummated sexual offense embodies an assault with intent to maim, disfigure or disable. Furthermore, assault with intent to maim, disfigure or disable and third degree sexual offense do not fall within any of the categories set forth in *Johnson.*

(Emphasis supplied).

Self evidently, even when dealing with Maryland statutes, it is absurd to look for legislative intent or for the lack thereof in circumstances wherein there would be no occasion for the Legislature to have an intent, one way or the other. One does not look for legislative intent where there was none. We are not unmindful of more permissive dicta in *White v. State,* 318 Md. 740, 745, 569 A.2d 1271 (1990), but without the intellectual discipline of *Johnson* and *Dillsworth,* the rule of lenity would be reduced to nothing but a convenient cover for a court to do whatever it felt like doing on a particular occasion. We are persuaded to abide by the solid wisdom of *Johnson* and *Dillsworth.*

### Three Common Law Crimes

■ Turning to the present case, the rule of lenity clearly does not apply. Robbery is a common law crime. It is not an offense created by the Maryland General Assembly. *Phenious v. State,* 11 Md.App. 385, 391, 274 A.2d 658, *cert. denied,* 262 Md. 748 (1971) ("Although neither robbery nor robbery with a deadly weapon are defined by the Md.Code, they are both punishable in Maryland since robbery was a crime at common law."); *Darby v. State,* 3 Md.App. 407, 413, 239 A.2d 584 (1968) ("Robbery is a crime in Maryland under the common law. It is not defined by statute but the penalty is fixed by statute. It thus retains its common law definition.").

False imprisonment is also a common law crime. It was not created by the Maryland General Assembly. *Street v. State,* 307 Md. 262, 265–66, 513 A.2d 870 (1986); *Midgett v. State,* 216 Md. 26, 39, 139 A.2d 209 (1958) ( ["False imprisonment] is a common law offense, and, in the absence of a statute, is punishable as such, as it is in this State."); *Watkins v. State,*

59 Md.App. 705, 723, 478 A.2d 326 (1984); *Hunt v. State,* 12 Md.App. 286, 311, 278 A.2d 637 (1971) ("The crime of false imprisonment remains punishable at common law.").

Assault, whatever its degree or statutorily prescribed punishment, remains a common law crime. It is not an offense created by the Maryland General Assembly. *White v. State,* 318 Md. at 746, 569 A.2d 1271, made it very clear that neither the legislative establishment of punishment for a crime nor the dividing of a crime into degrees (such as with murder, rape, or assault) amounts to the legislative creation of the crime:

> *The rule of lenity is simply a rule of statutory construction.* It originated in Supreme Court federal criminal cases. In the field of federal criminal law, offenses are created by acts of Congress. *Under Maryland law,* however, *there are a multitude of criminal offenses which were not created by Maryland statutes. They include both common law offenses and offenses based on pre–1776 English statutes. As to some of these, there simply is no Maryland legislation. As to others, the role of the General Assembly has largely been confined to prescribing the range of penalties and, in a few instances, dividing the offenses into degrees. Obviously a rule of statutory construction has little relevance to an offense not created by Maryland statute.*

(Emphasis supplied). As § 3–201(b) provides: " 'Assault' means the crime of assault, battery, and assault and battery, *which retain their judicially determined meanings."* (Emphasis supplied).

By close analogy, *Whack v. State,* 288 Md. 137, 140–41, 416 A.2d 265 (1980), makes it clear that simply providing a statutory sentence for the felony of robbery and creating, by statute, the aggravated form of robbery with a deadly weapon did not alter the fundamental common law character of the crime of robbery itself.

> In Maryland, *robbery is a single common law offense:* Art. 27, *§§ 486 and 488 do not create separate statutory offenses but merely fix the penalties for the one crime of robbery,* § 486 provides for not less than three and not more than

ten years' imprisonment. If the robbery, however, is committed 'with a dangerous or deadly weapon,' § 488 prescribes twenty years' imprisonment as the maximum penalty for robbery.

(Emphasis supplied). *Whack* went on, 288 Md. at 148, 416 A.2d 265:

[B]oth basic robbery under § 486 and robbery with a deadly weapon under § 488 constitute the same common law felony of 'robbery.'

Thus it is for the common law crime of assault as well.

The rule of lenity is, from start to finish, a rule of statutory construction. With respect to the three common law crimes before us in this case, there are no statutes to construe. The rule of lenity is not remotely pertinent.

## Fundamental Fairness and Merger

Although fully 99% of the merger cases have been decided by the application of either the constitutionally mandated "required evidence" test of *Blockburger v. United States* or statutory construction augmented by the rule of lenity, there has been "blowin' in the wind" in recent years a largely undefined third entry into the world of compulsory merger. It is labeled "fundamental fairness." In terms of not being pinned down, it is as elusive as Justice Potter Stewart's definition of "obscenity" in *Jacobellis v. Ohio,* 378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964): "I could never succeed in intelligibly [defining obscenity], but I know it when I see it."

Although there had been passing allusions to the notion of fundamental fairness, the phrase was generally invoked simply to buttress a decision that was actually based on the rule of lenity. *Williams v. State,* 323 Md. 312, 324, 593 A.2d 671 (1991) ("Considerations of fairness and reasonableness reinforce our conclusion."); *Claggett v. State,* 108 Md.App. 32, 54, 670 A.2d 1002 (1996) ("The fairness of multiple punishments in a particular situation is obviously important."). Fundamental fairness was not a dispositive criterion.

We have found only two cases wherein a merger was actually dictated by "fundamental fairness" as an autonomous criterion. In *Monoker v. State*, 321 Md. 214, 582 A.2d 525 (1990), the Court of Appeals held that the merger of two convictions was not compelled by either double jeopardy law or the rule of lenity. It held that merger was nonetheless required by "the principle of fundamental fairness." Judge Cole's opinion reasoned:

> *One of the most basic considerations in all our decisions is the principle of fundamental fairness in meting out punishment for a crime. While solicitation and conspiracy do not merge under the required evidence test,* we find it unfair to uphold convictions and sentences for both crimes. *Although solicitation is not always a lesser included offense of conspiracy, in Monoker's case the conspiracy* to burglarize the Dublin home certainly *did ripen from the solicitation* of Almony to commit that same crime. [W]e conclude that *because the solicitation was part and parcel of the ultimate conspiracy and thereby an integral component of it, it would be fundamentally unfair to Monoker* for us *to require him to suffer twice,* once for the greater crime and once for a lesser included offense of that crime. *For that reason his sentences should merge.*

(Emphasis supplied).

In *Marquardt v. State*, 164 Md.App. 95, 882 A.2d 900 (2005), neither the "required evidence" test nor the rule of lenity was an effective instrumentality to cause a conviction for the malicious destruction of property to merge into a conviction for fourth degree burglary. Invoking *Monoker's* "principle of fundamental fairness," however, this Court held, 164 Md.App. at 152–53, 882 A.2d 900:

> Under the facts of the present case, *the malicious destruction* of property *was clearly incidental to the breaking and entering* of 13 and 17 Bay Street. Thus, we are persuaded that Count 13, *malicious destruction of property*

at 17 Bay Street *should have been merged into* Count 12, *the burglary conviction* at that address[.]

(Emphasis supplied).

It is immediately apparent that a merger dictated by fundamental fairness is a very different doctrinal phenomenon. Merger pursuant to the "required evidence" test and merger pursuant to the rule of lenity can both be decided as a matter of law, virtually on the basis of examination confined within the "four corners" of the charges. Merger by virtue of the fundamental fairness test, by dramatic contrast, is heavily and intensely fact-driven.

*Monoker* and *Marquardt* inevitably raise fundamental questions about the very nature of the appellate function. Both *Monoker* and *Marquardt* involved their respective appellate courts in the *de novo* evaluation of the particular evidence in a particular case. The trial judges had made no antecedent evaluations nor were they required to under the special dispensation of Rule 4–345(a), exempting the review of an "illegal sentence" from the preservation requirement. *Monoker* decided, *de novo*, that "although solicitation is not always a lesser included offense of conspiracy," it was in fact "part and parcel of the ultimate conspiracy" under the particular facts of that case. 321 Md. at 223, 582 A.2d 525. *Marquardt* decided, *de novo*, that although the malicious destruction of property is not necessarily or even ordinarily incidental to a breaking and entering, it "was clearly incidental to the breaking and entering" under the particular facts of that particular case. 164 Md.App. at 152–53, 882 A.2d 900.

Those determinations may have been easy and uncontroversial under the facts of *Monoker* and *Marquardt,* but there will be other cases, cases in which fundamental fairness may be invoked, wherein the evidence calling for evaluation is more evenly balanced and perhaps even dependant on an assessment of credibilities. Should such evaluations of evidence be made in the first instance by an appellate court? Should cases calling for such evaluations enjoy the procedural dispensation of Rule 4–325(a)? When the evaluation process is necessarily

a flexible one, for instance, does Rule 4–325(a) "illegality" inhere in the non-merged sentence itself? Has the extension of merger law from the rule of lenity to fundamental fairness conceivably been "a bridge too far?" This is not just idle musing.

### "A Rose By Any Other Name ..."

We will focus our analysis on *Monoker*, for *Marquardt* simply followed *Monoker*. The promulgation of fundamental fairness as a third and independent test for merger came about in a single long paragraph at the tail end of a longer opinion dealing more fully and formally with other subjects.[2] Ironically, what *Monoker* did was to bring Maryland merger law full circle and to resurrect the "actual evidence" test that had been expressly rejected by the Court of Appeals in *Brooks v. State*, 284 Md. 416, 397 A.2d 596 (1979). In the repackaging process, *Monoker* simply put a new label on the "actual evidence" test, that of "fundamental fairness."

As early as 1968, in *Watts v. State*, 3 Md.App. 454, 240 A.2d 317, this Court had held that a merger of two convictions was compelled under the "actual evidence" test. We did so on a set of facts that today would call for precisely the same result under the "fundamental fairness" test. In repudiating *Watts v. State* ten years later, *Brooks v. State*, 38 Md.App. 550, 553, 381 A.2d 718 (1978), summed up the basis for the earlier decision in *Watts:*

> In *Watts v. State*, 3 Md.App. 454, 240 A.2d 317 (1968), we held, *under the circumstances* in that case, that the offenses of carrying a dangerous and deadly weapon openly with intent to injure a named person merged into the offense of assault with intent to murder that particular person. *Because the same weapon,* a sawed-off shotgun, *was used in each offense, and because the victims were the same persons*

---

**2.** As an appellate phenomenon, we note that it is frequently in the tail ends of opinions dealing more formally with something else that there first appear, for better or for worse, the creative sparks that will not fit within the standard definition of *stare decisis.*

described in each offense, *and because there was identity of time, place and circumstances of each offense, we held that 'The elements of the two crimes are the same.'*

(Emphasis supplied).

Under the facts in *Brooks,* moreover, the conviction for carrying a weapon openly with the intent to injure was clearly incidental to the conviction for assault with intent to murder. Merger would have been compelled under the "actual evidence" test, as it would be compelled today under the "fundamental fairness" test. Recognizing that the Court of Appeals had, in *Newton v. State,* 280 Md. 260, 373 A.2d 262 (1977), rejected the "actual evidence" test, however, not only for double jeopardy purposes but for Maryland merger law as well, we abandoned our earlier position in *Watts.*

It is clear that *Watts* was decided under what the Court of Appeals has termed the *"actual evidence" test,* i.e., *whether the evidence actually produced at trial on both offenses is substantially the same. This test was specifically rejected by the Court of Appeals in Newton in favor of the* "required evidence" test quoted above. In light of *Newton, we now overrule our holding in Watts* that the offenses of carrying a dangerous and deadly weapon openly with intent to injure a named person and assault with intent to murder that person merge.

38 Md.App. at 553, 381 A.2d 718 (emphasis supplied).

In *Newton,* 280 Md. at 268, 373 A.2d 262, Judge Eldridge had held:

Thus, *under* both federal double jeopardy principles and *Maryland merger law, the test* for determining the identity of offenses *is the required evidence* test. If each offense requires proof of a fact which the other does not, *the offenses* are not the same and *do not merge.*

(Emphasis supplied).

In affirming this Court's decision in *Brooks,* the Court of Appeals in its *Brooks v. State,* 284 Md. at 417, 397 A.2d 596, was emphatic that it was dealing not with double jeopardy law primarily but with Maryland merger law generally:

The issue in this case is whether the "required evidence test" or the "actual evidence test" is *the general standard under Maryland law for determining whether one criminal offense merges into another.*

(Emphasis supplied).

Brooks himself was arguing that the Maryland merger test is broader than the double jeopardy test and should apply to convictions that "rest upon substantially identical 'actual evidence.'"

Brooks also appears to concede that this is the appropriate standard for deciding whether separate offenses should be treated as a single offense for double jeopardy purposes. *He argues, however, that the standard for determining merger of offenses is somewhat broader, and that if two convictions rest upon substantially identical 'actual evidence,' there should be a merger.*

284 Md. at 419, 397 A.2d 596 (emphasis supplied).

Citing a long line of Maryland cases stretching back to 1921, the Court of Appeals, 284 Md. at 420–21, 397 A.2d 596, pointed out that the actual evidence not only was not "the Maryland test for merger" but never had been.

To the extent that there may be a suggestion in the Court of Special Appeals' opinion in the instant case that, prior to our opinion last year in *Newton v. State, supra,* the 'actual evidence test' rather than the required evidence test was the general standard for determining merger of offenses in Maryland, such suggestion is erroneous. Moreover, *the cases do not support the defendant's contention that the actual evidence test is presently the Maryland test for merger.* On the contrary, *the cases in this Court have consistently taken the position that the general test for determining merger of offenses, as well as for deciding whether two offenses should be deemed the same for double jeopardy purposes, is the required evidence test.*

(Emphasis supplied). The "actual evidence" test and the "fundamental fairness" test are indistinguishable.

It is inconceivable that *Newton* and *Brooks* have been overruled *sub silentio* by the stealth tactic of simply substituting "fundamental fairness" as a pseudonym for the long-rejected "actual evidence" test. In the immortal words of Yogi Berra, "It's *deja vu* all over again." *Monoker,* of course, mentioned neither of those cases in that context.

### Cutting the Gordian Knot

We have reviewed merger pursuant to double jeopardy law and we hold that merger is not required. We have reviewed merger pursuant to the rule of lenity and we hold that merger is not required. We decline, however, to review the issue of merger pursuant to the so-called "fundamental fairness" test because we do not believe that it enjoys the procedural dispensation of Rule 4–345(a). We do not believe that a non-merged sentence pursuant to such a fluid test dependant upon a subjective evaluation of the particular evidence in a particular case is an inherently "illegal sentence" within the tightly limited contemplation of the rule. Neither *Monoker* nor *Marquardt* suggest otherwise, for in both of those cases the merger issue was raised on direct appeal and not via Rule 4–345(a).

Alternatively, even if, *arguendo,* there is such a thing as the fundamental fairness test and even if the merits of this merger issue were, *arguendo,* before us, we believe it eminently clear that the two-to-three hour first-degree assault in this particular case was no mere incident of either the robbery or the false imprisonment. We hold that it does not merge into either of those convictions. By the same token, we hold that the false imprisonment that began long before the robbery was no mere incident of it, and, accordingly, would not merge into it. We affirm Judge Levitz in his denial of the appellant's Rule 4–345(a) motion.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.**