53 A.3d 492

**Robert Edward QUANSAH**

v.

**STATE of Maryland.**

**No. 2433, Sept. Term, 2010.**

Court of Special Appeals of Maryland.

Sept. 26, 2012.

638

Michael R. Braudes (Paul B. DeWolfe, Public Defender, on the brief) Baltimore, MD, for appellant.

Sarah Page Pritzlaff (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: KEHOE, BERGER, ARRIE W. DAVIS, (Retired, Specially Assigned), JJ.

ARRIE W. DAVIS (Retired, Specially Assigned), J.

A jury in the Circuit Court for Baltimore County convicted Robert Edward Quansah, appellant, of second-degree assault and violating a peace order, and acquitted him of first-degree assault, arson, threat of arson and two other arson-related offenses. The court imposed consecutive sentences of ten years for the assault and ninety days for the peace order violation.

Challenging those convictions and sentences, appellant raises three questions for our review, which we revise as follows:

1. Did the trial court err in imposing separate and consecutive sentences for second-degree assault and violating a peace order?

2. Did the trial court err in admitting an extrajudicial statement of the assault victim, Martha Kembumbala, from her application for a peace order?

3. Did the trial court err in excluding evidence that Kembumbala threatened to harm appellant?

We conclude that, under the Rule of Lenity, appellant's sentence for violating a peace order must be merged into his sentence for second degree assault because both convictions may have been based on a single act. Because we conclude that the trial court did not err in admitting Kembumbala's statement and did not exclude evidence of a threat by Kembumbala, we shall affirm appellant's convictions.

## FACTS AND LEGAL PROCEEDINGS

At a three-day trial, the State presented evidence that, on the same day that appellant was served with a peace order requiring him to stay away from the residence where he was renting a room from Martha Kembumbala, appellant returned to the premises and beat her with a tire iron. Two of Kembumbala's other tenants confirmed her account of the attack.

Appellant's defense, as articulated in defense counsel's opening statement, was that Kembumbala obtained the peace order in order to "get even" with him after he ended their romantic relationship and that she then sent Timothy Allen, one of her tenants, to assault appellant when he parked across the street in the taxicab that he drove as a part-time job. According to appellant, Kembumbala fled when she saw him chasing after Allen with a tire iron, falling twice and sustaining the injuries that she later claimed were inflicted by appellant. Admitting that he made physical contact with Kembumbala, appellant maintained that he did so only after he heard gunshots, when he ran to Kembumbala in order to protect her. Shortly after the altercation, appellant drove to

the police station to report the assault by Allen but, instead, was arrested and charged with assault based on Kembumbala's complaint.

Martha Kembumbala testified that, in the spring of 2009, she owned and resided at a six-bedroom house located at 3613 Washington Avenue in the Gwynn Oak area of Baltimore County. In May 2009, she was renting rooms to several individuals, including appellant, Timothy Allen, and Allen's girlfriend, Pauline Francois. About three weeks after appellant moved into her residence in March of 2009, Kembumbala and appellant "went out a couple of times" but it "wasn't really a serious relationship." Because appellant soon became verbally and emotionally abusive, calling her derogatory names and demanding sexual relations, Kembumbala ended the romantic relationship.

According to Kembumbala, appellant thereafter threatened "more than five times" that, if she attempted to evict him, he would burn the house down. Despite these warnings and appellant's attempts to continue the relationship, Kembumbala instructed appellant to move out during the first week of May, but he did not do so.

On Sunday, May 24, 2009, Kembumbala contacted appellant's pastor and twice called 911 for police assistance due to appellant's continued presence and threats.[1] When an officer told her that he could not help unless she obtained a peace order, Kembumbala went to district court and obtained an interim peace order at 1:23 a.m. on Monday, May 25, 2009. The peace order, which was admitted into evidence, prohibited appellant from contacting Kembumbala, attempting to contact her or entering her property. A Baltimore County police

---

1. Kembumbala testified that the Sunday and Monday time period during which she called police, sought the peace order, and appellant beat her were May 25 and 26, 2009. The calendar and court documents, however, establish that the relevant Sunday was May 24, 2009, and that the Monday on which the altercation between Kembumbala and appellant occurred was May 25, 2009.

officer served appellant with the order and escorted him from Kembumbala's property at 5:00 a.m. that same morning.

Later that day, as she was leaving her shift as a private duty nursing aide at 11:00 p.m., Kembumbala saw appellant drive his taxicab past the premises where she was employed. When she arrived home, Kembumbala smelled a strong odor of gasoline. Accompanied by Allen and Francois, Kembumbala went outside and discovered that the exterior wall and two windows outside her bedroom had been blackened by fire.

Kembumbala testified that, while she, Allen, and Francois were still outside, she called 911 on her cell phone and simultaneously continued to look around the premises. She heard Francois call out and, when she went to the front of the house, she saw appellant parked across the street in his taxi.

When appellant saw Kembumbala, he got out of his vehicle, "grabbed [her] from the back" as she attempted to get inside her house, and struck her repeatedly with a black steel object, landing blows on her head, knee, and toe, and causing her to fall on the grass. As he hit her, appellant repeatedly stated, "I told you I was going to kill you." Before briefly losing consciousness, Kembumbala heard a "gunshot, pop-pop like two or three times" and then saw appellant enter his taxi. When police and paramedics arrived, she declined to go to the hospital, but later went because her pain worsened.

Baltimore County Police Officer Zachary Small testified that, when he responded to a 911 call from Kembumbala's residence, she "had several injuries. Her clothing was disheveled. She was visibly shaking, crying." On the grass beside her driveway, the officer discovered "a tire iron that was laying near" Kembumbala's shoes, bracelet, car keys and Bluetooth earpiece.

A fire inspector testified that gasoline had been poured along two window frames and fires intentionally ignited in both locations, but the fires had burned out. A container of gasoline, which Kembumbala explained was used to fuel a lawnmower, was found "between half and full" in the garage on the property. Photos depicting Kembumbala's injuries, the

tire iron and the burned areas of the house were admitted into evidence.

After Officer Small returned to the police station, appellant came in "to report that he had been assaulted." Appellant was advised of his *Miranda* rights and elected to provide his account of the altercation. Appellant told the officer that he was across the street from Kembumbala's residence when Allen assaulted him and "fired several shots from an unknown handgun." Appellant claimed that he then grabbed his tire iron and chased Allen across the street, but that he dropped it and that he did not assault Kembumbala. According to the officer, appellant did not complain of any injuries and none were visible.

Timothy Allen and Pauline Francois confirmed Kembumbala's account of the arson and the assault. Both testified that, on the evening of the incident, Kembumbala came to their room while they were watching a movie to enlist their assistance in investigating a strong odor of gasoline. The trio went outside, where they discovered that a wall of the house had been burned. When Kembumbala got to the front of the house, she spotted appellant across the street; Allen and Francois also saw him "sitting in a taxi watching the house." Both witnesses recounted that, "[a]s soon as he spotted" them, appellant "jumped out" of his vehicle "charging towards" them, carrying a long, shiny, black, pipe-like object. Allen and Francois ran and then heard "pow-pow-pow," which they perceived to be gunshots.[2] They looked back at the house and saw appellant "repeatedly beat" Kembumbala "more than five times" with the weapon, then "ran back to the cab and pull[ ] off."

Appellant testified in his own defense. He claimed that he began a romantic and sexual relationship with Kembumbala within three or four weeks after he moved into her house.

---

**2.** Allen, who was incarcerated at the time of trial awaiting sentencing on a charge of violating probation and had an unrelated assault conviction, denied that he fired a gun. Police searched the area and Kembumbala's house, but did not recover a gun.

According to appellant, because Kembumbala was seeing other men and taking financial advantage of him, he ended the relationship. On the Sunday before Kembumbala obtained the peace order, appellant told her that he was planning to move out of her house that Tuesday.

Appellant maintained that Kembumbala's allegations in support of the peace order were false, denying that he hurt her in any way and that he threatened to burn her house and choke her. After appellant left Kembumbala's house as a result of the peace order, he decided to stay in his car, as he waited for the hearing that was scheduled three days later and to get his money back from Kembumbala.

Later that night, appellant drove his cab to the apartment complex across the street from Kembumbala's house, planning to call his brother to pick him up there, because the cab company tracked the vehicle by "GPS" and required him to park it at his address-of-record when not on duty. While appellant was sitting in the cab, Timothy Allen approached. When appellant rolled down his window, Allen immediately punched him in the face, then ran. Appellant saw that Allen had a handgun. Appellant believed that Kembumbala sent Allen to attack him.

After Allen punched him, appellant grabbed a tire iron that he had recently used to fix a flat tire, got out of the cab and began to chase Allen, who succeeded in eluding him. When Kembumbala saw appellant chasing Allen, she ran, falling on the gravel driveway twice. Appellant then heard shots fired and ran to Kembumbala. He "embrace[d] her and . . . shook her," asking "why are you doing this . . . why do you hire somebody to kill me[?]"

According to appellant, Kembumbala's falls accounted for her injuries, which were inconsistent with the tire iron beating described by Kembumbala, Allen and Francois. When he went to the police station to report the assault by Allen and show his swollen face, he was arrested based on Kembumbala's complaint.

Appellant's brother, James Quansah, testified that appellant is "a quiet, gentle man" who "worked as an aide for the adult and disabled" and also ministered to others as a pastor. According to James, his brother's face was bruised and swollen when he visited him in jail about a week after the incident.

## DISCUSSION

## I

### Sentencing Merger

Appellant argues that "the trial court erred in imposing separate sentences for assault and violation of a peace order" even though both convictions arose from the same conduct. "Under the Double Jeopardy Clause, a defendant is protected against multiple punishment for the same conduct, unless the legislature clearly intended to impose multiple punishments." *Jones v. State*, 357 Md. 141, 156, 742 A.2d 493 (1999). As this Court has explained, when two statutory crimes arise out of the same act,

[i]t is purely a question of reading legislative intent. If the Legislature intended two crimes arising out of a single act to be punished separately, we defer to that legislated choice. If the Legislature intended but a single punishment, we defer to that legislated choice. If we are uncertain as to what the Legislature intended, we turn to the so-called "Rule of Lenity," by which we give the defendant the benefit of the doubt.

*Walker v. State*, 53 Md.App. 171, 201, 452 A.2d 1234 (1982) (citations omitted); *see Pair v. State*, 202 Md.App. 617, 638, 33 A.3d 1024 (2011), *cert. denied*, 425 Md. 397, 41 A.3d 571 (2012).

Appellant argues that "it is entirely possible that the jury predicated both convictions upon the same conduct" because the trial court instructed the jury that the State had the burden to prove that appellant "failed to comply with any term of the peace order," and "the assault was the most prominent alleged violation" of the peace order. Invoking the Rule of Lenity, appellant contends that there is "no indication that the

legislature in [this] context intended multiple punishment" to be imposed for convictions arising from a single act, so that his ninety-day sentence for violating the peace order must be merged into his ten-year sentence for assault. Alternatively, appellant maintains that "merger is required as a matter of fundamental fairness" because "the assault and violation of the peace order were effectively a single event," "[t]he peace order was in effect for an extremely brief period" and "the evident purpose" of criminalizing both offenses is to protect persons like Ms. Kembumbala.

The State disputes that both convictions arose from a single act, arguing that the jury "likely" convicted appellant of second-degree assault and violating the peace order based on separate criminal acts, so that the trial court did not err in imposing separate punishments.

If, as the State maintains, there were separate factual bases for the two convictions, then the trial court clearly had authority to impose separate consecutive sentences for each conviction. See, e.g., Kelly v. State, 195 Md.App. 403, 442, 6 A.3d 396 (2010) ("Principles of fairness do not prevent separate sentences for [the] separate offenses" of conspiracy to commit robbery and robbery.), cert. denied, 417 Md. 502, 10 A.3d 1181 cert. denied, —— U.S. ——, 131 S.Ct. 2119, 179 L.Ed.2d 912 (2011); Wooten–Bey v. State, 76 Md.App. 603, 629, 547 A.2d 1086 (1988) (Rule of Lenity does not require merger of sentences for "two separate criminal acts for which the Legislature has provided distinct punishments," such as planning a robbery and committing a robbery), aff'd on other grounds, 318 Md. 301, 568 A.2d 16 (1990). Thus, we must first address, as a threshold question, whether appellant's two convictions arose from a single act.

### A. Single Act Basis for Appellant's Convictions

Second-degree assault is a statutory crime that encompasses the common law crimes of assault, battery, and assault and battery. See Md.Code (2002, 2012 Repl.Vol.), § 3–203(a) of the Criminal Law Article (Crim.) ("A person may not commit an assault."); Crim. § 3–201(b) (defining "assault" to

mean "the crimes of assault, battery, and assault and battery, which retain their judicially determined meanings"); *Nicolas v. State*, 426 Md. 385, 402–03, 44 A.3d 396 (2012). A battery is a touching that is either harmful, unlawful or offensive. *Marlin v. State*, 192 Md.App. 134, 166, 993 A.2d 1141, *cert. denied*, 415 Md. 339, 1 A.3d 468 (2010). *See also Nicolas*, 426 Md. at 403, 44 A.3d 396 ("an assault of the battery variety is committed by causing offensive physical contact with another person."). Second-degree assault is a misdemeanor that carries a maximum term of imprisonment of ten years. Crim. § 3–203(b).

Under Md.Code (1973, 2006 Repl.Vol.), § 3–1508 of the Courts & Judicial Proceedings Article (CJP),

> (a) Fines or imprisonment.—An individual who fails to comply with the relief granted in an interim peace order under § 3–1503.1 of this subtitle [governing peace orders] ... is guilty of a misdemeanor and on conviction is subject to: (1) For a first offense, a fine not exceeding $1,000 or imprisonment not exceeding 90 days or both. . . .
>
> (b) Arrest.—A law enforcement officer shall arrest with or without a warrant and take into custody an individual who the officer has probable cause to believe is in violation of an interim peace order ... in effect at the time of the violation.

In the State's view, appellant's admission that, "when he was running toward Kembumbala, he knew that he was not supposed to have any contact with her or be on her property," supported a conviction for "violating the peace order by going onto her property and making contact with her," whereas the evidence that appellant subsequently beat her with the tire iron separately supported the assault conviction. For the reasons explained below, we disagree with the State's interpretation of the verdicts and, instead, conclude that the likely factual basis for both verdicts was that appellant grabbed Kembumbala.

### 1. Standards Governing Review of Jury Verdicts

The Court of Appeals has held that

the appropriate standard to apply when addressing a question of factual ambiguity in the context of merging convictions is to resolve the ambiguity in the defendant's favor in a situation where it is impossible to know for certain the rationale of the trier of fact for finding the convictions entered against the defendant.

*Nicolas*, 426 Md. at 408 n. 6, 44 A.3d 396.

In *Nicolas*, the Court considered ambiguities in convictions for resisting arrest and assault, stemming from an altercation involving multiple police officers. *See id.* at 410–12, 44 A.3d 396. After reviewing the trial transcript, the jury instructions and the verdict sheet, the Court of Appeals held "that the record is ambiguous as to the factual bases for which the jury found Petitioner guilty of second degree assault of" two different officers who arrested him, because "a reasonable jury could have found that the assaults were based on acts that preceded the officers' attempt to arrest Petitioner, or that the assaults were an integral part of the resisting arrest." *Id.* at 412, 44 A.3d 396. Given that ambiguity, "the trial judge should have merged the assault convictions into the conviction for resisting arrest." *Id.*

Our task, therefore, is to review the record to determine whether, as appellant claims, there is a comparable ambiguity about whether the jury convicted him of violating the peace order and second degree assault based on a single criminal act.

## 2. The Record

Before closing arguments began, the trial court instructed the jury that second-degree assault "is causing offensive physical contact to another person" and that, "[t]o convict the Defendant of violation of a peace order, the State must prove ... that the Defendant failed to comply with any term of that peace order."

During the State's closing argument, the prosecutor reviewed the evidence supporting each of the charges against appellant. After presenting the State's theory that appellant

used gasoline from the container in Kembumbala's garage to willfully "set fire to or burn[ ] at least part" of Kembumbala's house, the prosecutor addressed the charges of assault and violating the peace order, as follows:

[Appellant] is also charged with second degree assault. Now, a second degree assault under the law can be something as mild as a push or a slap, and *any kind of contact that a person finds offensive and does not consent to, that's a second degree assault.*

Certainly, after what you have heard you can all agree that at a minimum the Defendant committed a second degree assault against Ms. Kembumbala that night. I mean, when you heard him testify, *he actually admitted to committing a second degree assault because . . . he grabbed her, he shook her,* and then he acted as a human shield trying to protect her.

I ask that you not believe the last part but *I will say that the grabbing and the shaking at a minimum is a second degree assault.* So that has already been proved by the Defendant's own admission.

However, he went further, and he is charged as a consequence with first degree assault.

A first degree assault is an assault where the Defendant intended to cause serious physical injury. So *it is more than a grabbing and a shaking.* It is more than a slap or a hit to the face. *It is, for example, taking a tire iron made of metal and cracking someone over the head with it,* as the Defendant did in this case. . . .

The Defendant is also charged with the violation of a peace order. And we know now after hearing all the evidence, and you will see the evidence, that the peace order was in place, that it did exist and the Defendant knew about it. *He went there in violation of the order.*

Now, he says he went there because he wanted to park his car closer to the house. Well, maybe he got a cab so he had a reason to return to the property. In any event, he wasn't supposed to be there, cab or no cab. *He certainly*

*wasn't supposed to be in the yard wh[ere] he has already admitted he's gone, and he wasn't supposed to have any contact with Ms. Kembumbala.*

*So, even if his story is true about what he testified to today, there would have been no reason for him to run up into the yard and grab her that way because he had been court ordered not to have any contact with her.*

*So he is guilty of violating that peace order.* He failed to comply with the major conditions of that order.

(Emphasis added.)

In appellant's closing argument, defense counsel portrayed Ms. Kembumbala as a vengeful, scorned ex-lover who "fabricated" both the fire and her claim that appellant beat her with the tire iron that he admitted leaving on her property. In support, counsel pointed out that Allen and Francois did not smell any gasoline until after Kembumbala arrived home; that the gasoline container was still half-full; that Kembumbala's injuries were consistent with appellant's description of her falls and inconsistent with the prosecution witnesses' accounts of a repeated beating with a tire iron; that there was no evidence of Kembumbala's blood or DNA on the tire iron; that in the 911 recording of Kembumbala's call, instead of expressing fear and reporting appellant's presence at the moment she saw him parked across the street, Kembumbala yelled "get him" [3] and hung up; and that appellant voluntarily went to police and "told the same story from day one."

At the end of his argument, defense counsel summarized the defense theory of the case:

He didn't attempt to violate a peace order, he didn't burn anybody's house. He didn't assault Ms. Kembumbala. He didn't knock her down. *He embraced her, is his testimony, and said, why are you doing this to me,* why are people shooting?

---

3. Ms. Kembumbala testified that it was the voice of Ms. Francois heard on the 911 recording.

I don't think she probably even knew what the shooting was about, that Tim Allen had ... gone to that level. But the whole thing exploded. And I submit to you that this was Ms. Kembumbala setting this man up and then going through with the set up. And it is not preposterous, it is not crazy, and it is not beyond what people do. And if there weren't facts to support that, I wouldn't have a leg to stand on. But you have major facts to support—you have this whole gas thing. That's major number one. You have "get him" on the tape and terminating a 911 call, but, above all, there is no evidence in this case of a tire iron beating, period. Does not exist. If it doesn't exist, they're lying, and you should find the man not guilty.

(Emphasis added.)

### 3. Factual Basis for the Verdicts

■ The State contends that the "conviction for violating the peace order likely was based upon [appellant's] actions in entering Kembumbala's property and making contact with her, whereas his assault conviction was based upon the beating." We disagree. Based on the trial court's instructions, closing arguments and the evidence discussed therein, we conclude that the jury reasonably could have found that appellant committed a second-degree assault when he grabbed Kembumbala and that the same act also constituted a violation of the peace order. Indeed, the prosecutor expressly invited the jury to make such a finding. Thus, it is just as plausible, if not more so, that the jury found that the State failed to prove beyond a reasonable doubt that appellant committed either arson or first degree assault (*i.e.*, the tire iron beating), but convicted appellant of the two lesser crimes in the indictment, based on the prosecution theory that appellant violated the peace order and committed second-degree assault by grabbing Kembumbala.

We are not persuaded by the State's suggestion that the verdicts were based on different acts because appellant violated the peace order by returning to Kembumbala's residence and thereafter committed a second-degree assault by grabbing

Kembumbala. In *Walker v. State,* 53 Md.App. 171, 452 A.2d 1234 (1982), we rejected an analogous argument that the jury convicted the accused of a single count of assault and another count of attempted rape based on separate acts that occurred during a single criminal episode. Judge Moylan's explanation for why the law and the charging document did not support such an interpretation of the verdicts is instructive in appellant's case.

In an effort to forestall [sentencing merger], the State strains to have us treat the common law assault as an attack separate and distinct from the attack that was initiated and continued for purposes of accomplishing the rape. It maintains that the initial threat at knifepoint was all that was necessary to constitute either (1) the overt act of the attempted rape or (2) the assault with intent to rape; and that the subsequent beating (producing the broken nose and the broken jaw) was gratuitously extra and thereby constituted a separate and additional assault. The argument collapses of its own weight. Because an assault turns out to be more vicious and more protracted than would be minimally necessary to constitute the crime does not operate to subdivide it thereby into two (or even three or four) separate assaults. Assault may range along its spectrum from the least significant to the most aggravated of attacks.... Though ranging from one end of the spectrum to the other, there is still the single crime of assault.

If, as the State maintains, the sentence was for a "second assault," we are constrained to ask whatever happened to the "first assault?" If the verbal order to disrobe at knifepoint was the first assault, and the breaking of the jaw a second and distinct assault, why were not two assault counts placed in this indictment? Does the State maintain that the appellant could have been sentenced separately and consecutively for two separate assault convictions under a single count? The answer ... is obviously, "No," and is, therefore, dispositive of the State's attempt to find two separate assaults within the confines of the charges in this case. There was a single, albeit lengthy and vicious, attack.

The common law assault was part of the attempted rape and should have been merged into it.

*Id.* at 201–02, 452 A.2d 1234.

Applying this reasoning to the record before us, we conclude that the State may not avoid sentencing merger on the theory that the jury convicted appellant of violating the peace order based on appellant's mere presence on Kembumbala's property, whereas it convicted appellant of assault based on his admission that he subsequently grabbed Ms. Kembumbala. The fact that appellant's violation of the peace order turned out to be more protracted than would be minimally necessary to constitute that crime does not permit us to parse it into multiple violations. *See id.* If appellant's presence on Kembumbala's property constituted one violation of the peace order and his physical contact with her constituted a second and distinct violation, the indictment should have had two counts charging violation of the peace order. *See id.* Instead, there was a single violation of the peace order charged and argued to the jury, based on the undisputed evidence that appellant made physical contact with Ms. Kembumbala while on her property.

Thus, we conclude that, at the very least, there is ambiguity about whether the conviction for violating the peace order stemmed from the same physical contact upon which the guilty verdict on the second-degree assault charge is likely premised. This ambiguity must be resolved in favor of appellant. *See Nicolas,* 426 Md. at 412, 44 A.3d 396; *Walker,* 53 Md.App. at 201–02, 452 A.2d 1234.

■ We therefore proceed with our sentencing merger analysis on the premise that the two verdicts arose from a single criminal act. Although appellant's sentences do not merge under the required evidence test because each offense requires proof of distinct elements, nevertheless merger may be necessary if the Legislature did not intend to authorize multiple punishments based on a single act of assault or there is uncertainty as to whether the Legislature intended to do so. *See generally Moore v. State,* 198 Md.App. 655, 682–94, 18

A.3d 981 (2011) (thoroughly reviewing sentencing merger prin-
ciples and recognizing that merger may be required under
either the required evidence test, the Rule of Lenity or
principles of fundamental fairness); *Pair,* 202 Md.App. at 637,
33 A.3d 1024 ("Even when the merger of sentences is not
compelled by the 'required evidence' test of *Blockburger v.
United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306
(1932), it may nonetheless be compelled by the rule of leni-
ty."). We address that question next.

### B. Legislative Intent to Authorize Multiple Sentences

Appellant argues that there is "no indication that the legis-
lature in the instant context intended multiple punishments."
In appellant's view, "it is significant that [CJP] § 3–1508 ...
mandates a fine and incarceration" for violating a peace order,
"but does not contain an anti-merger provision permitting
sentencing for related offenses despite the fact that a violation
of a peace order will frequently take the form of a separate
offense." *Cf. Tribbitt v. State,* 403 Md. 638, 652–53, 943 A.2d
1260 (2008) (recognizing that the Legislature enacted an ex-
press anti-merger provision in order to authorize separate and
consecutive sentences for a single act that constitutes both
child abuse and a crime of violence).

The State counters that, even if appellant's sentences for
assault and violating a peace order are based on a single act,
they "do not merge under the Rule of Lenity because the
crimes and penalties for assault and violating a peace order
address different criminal behavior." In support, the State
argues that, "[w]hereas assault is a crime against a person,
violating a peace order punishes the violation of a court
order." In addition, the State invokes CJP § 3–1502(a), which
provides that, "[b]y proceeding under this subtitle [governing
peace orders], a petitioner is not limited to or precluded from
pursuing any other legal remedy[,]" asserting that this provi-
sion "further indicates that the Legislature intended that the
violation of a peace order should operate independently of any
other crime."

We are not persuaded that CJP § 3–1502(a) effectively operates as an "anti-merger" provision. This subsection permits "a petitioner" to pursue legal remedies other than a peace order and "petitioner" is statutorily defined to mean "an individual who files a petition under § 3–1503 of this subtitle." Thus, the plain language of the statute permits an individual who obtains a peace order to seek additional relief, such as other civil remedies. There is no language indicating that the Legislature intended this provision to apply to the State, much less that it was intended to permit the State to impose multiple criminal punishments.

Nevertheless, we cannot agree with appellant that the absence of anti-merger language in the peace order subtitle indicates that the Legislature intended that sentences for violating a peace order and second-degree assault should be merged. Such silence means nothing more than that the Legislature did not explicitly address the topic of merger in the statutory scheme.

As alternative support for its anti-merger interpretation of the peace order subtitle, the State relies on the principle that, "when two separate criminal statutes create separate offenses based on different behavior with different criminal consequences, and there is no relevant legislative history suggesting that the Legislature intended to prohibit the imposition of separate sentences for the two separate crimes, the rule of lenity does not apply." *Fenwick v. State*, 135 Md.App. 167, 174–75, 761 A.2d 1021 (2000). To be sure, under this analytical framework, we have held that separate sentences for conspiracy to rob and attempted robbery "make sense" because "the two crimes and penalties address different criminal behavior," *i.e.*, planning a robbery and thereafter committing one. *Wooten–Bey*, 76 Md.App. at 627–30, 547 A.2d 1086. *Cf. Fenwick*, 135 Md.App. at 175, 761 A.2d 1021 (declining to merge sentences for conspiracy to distribute cocaine and distribution of cocaine). Conversely, we also have held that separate sentences for uttering and attempted theft must be merged under the Rule of Lenity when they are based on the same criminal act. *See Moore*, 198 Md.App. at 703–04, 18

A.3d 981 (Because "[a]ppellant's convictions for uttering and attempted theft all arose out of the same transaction, namely, appellant's attempt to cash two forged checks at the M & T Bank on September 6, 2006" and "there is no indication in the language of the statutes governing theft and uttering that the legislature intended separate punishments for these offenses arising out of the same transaction, the rule of lenity requires a merger[.]").

The State posits that the sentences imposed for the separate offenses of second-degree assault and violation of the protective order are "based on different behavior" because the peace order statute "punishes the violation of a court order," whereas "assault is a crime against the person." This argument ignores that the peace order statute, like second-degree assault, punishes unlawful contact with a person and that appellant's two sentences punish him for the same "criminal behavior"—the unlawful contact that occurred when he grabbed Kembumbala.

We find nothing to indicate whether the Legislature intended to authorize multiple punishments for a second-degree assault and a violation of a protective order based on the same assaultive behavior. When "we are uncertain as to what the Legislature intended, we turn to the . . . 'Rule of Lenity' by which we give the defendant the benefit of the doubt." *Walker*, 53 Md.App. at 201, 452 A.2d 1234. Accordingly, we hold that appellant's ninety-day sentence for violating the peace order must be merged into his ten-year sentence for second-degree assault. *See generally Abeokuto v. State*, 391 Md. 289, 356, 893 A.2d 1018 (2006) ("the offense carrying the lesser maximum penalty ordinarily merges into the offense carrying the greater maximum penalty").

## II

### Admission of Extrajudicial Statement From Ms. Kembumbala's Peace Order Application

Appellant next contends that the trial court erred in admitting a portion of the written statement made by Martha

Kembumbala in support of her application for the peace order. In appellant's view, Kembumbala's extrajudicial statement was not admissible as a prior consistent statement and, in any event, "the prejudicial effect of this evidence greatly outweighed any conceivable probative value."

The State responds that the trial court correctly ruled that the defense opened the door, during its cross-examination of Kembumbala, for this statement from her peace order application to be admitted for rehabilitative purposes. Moreover, the admission of this statement was not unduly prejudicial in light of other evidence elicited by the defense.

After reviewing the pertinent legal principles, we conclude that, for the reasons set forth below, the trial court did not err in admitting the challenged statement.

### A. Admissibility of Prior Consistent Statements

█ " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Md. Rule 5–801(c). Unless expressly permitted, "hearsay is not admissible." Md. Rule 5–802. Although a trial court's ruling on the admissibility of evidence is generally reviewed for abuse of discretion, a decision to admit or exclude hearsay is an issue of law that we review *de novo*. *Bernadyn v. State*, 390 Md. 1, 7–8, 887 A.2d 602 (2005).

█ Among the established exceptions to the rule against hearsay is one for a prior consistent statement made by a witness. Maryland Rule 5–802.1 provides in pertinent part:

The following statements previously made by a witness who testifies at the trial or hearing and who is subject to cross-examination concerning the statement are not excluded by the hearsay rule: ...

(b) A statement that is consistent with the declarant's testimony, if the statement is offered to rebut an express or implied charge against the declarant of fabrication, or improper influence or motive[.]

This hearsay exception does not apply to statements made by the declarant after his or her alleged motive to fabricate existed, because only " '[a] consistent statement that predates the motive is a square rebuttal of the charge that the testimony was contrived as a consequence of that motive.' " *Holmes v. State*, 350 Md. 412, 419, 712 A.2d 554 (1998) (quoting *Tome v. United States*, 513 U.S. 150, 158, 115 S.Ct. 696, 701, 130 L.Ed.2d 574 (1995)).

When a prior consistent statement is inadmissible under Rule 5–802.1(b), it may nevertheless be admissible as nonhearsay to bolster credibility under Rule 5–616(c)(2), which provides that "[a] witness whose credibility has been attacked may be rehabilitated by ... evidence of the witness's prior statements that are consistent with the witness's present testimony, when their having been made detracts from the impeachment." *See id.* at 426–27, 712 A.2d 554. Although it is appropriate for the trial court to give a limiting instruction that the jury may not consider such rehabilitative statements as substantive evidence, the trial court need not do so in the absence of such a request. *Id.* at 429, 712 A.2d 554.

### B. Admission of Statement from Kembumbala's Peace Order Application

Before trial, the State moved *in limine* to admit portions of Kembumbala's written application for the peace order, including a statement that appellant "has sexually assaulted me without my consent. He has threat [sic] to choke me to death. He has threatened to burn down my house." The State argued that these statements were "not hearsay" because they were offered "for their effect on the hearer. It shows why she obtained the peace order." The trial court denied the motion, explaining that, because Kembumbala wrote the statements, they were not admissible to show either the effect they had on her or appellant's motive and intent.

At trial, Kembumbala testified on direct examination that, two weeks into her relationship with appellant, he became verbally abusive and made "a lot of threats, especially try-

ing—telling me that he was going to burn my home if I ever try to kick him out of the house[.]" Kembumbala claimed that, when she ended the relationship "around the first week of ... May" and asked appellant to move out of her house, "[h]e didn't like it at all." Kembumbala twice called 911 on May 24, but the police officer who responded told her that he could not do anything unless she got a peace order. Immediately thereafter, at about 1:00 a.m. on May 25, 2009, Kembumbala applied for and obtained a peace order.

Although Kembumbala did not testify on direct examination about the sexual nature of her relationship with appellant and she did not describe any physical or sexual abuse, defense counsel pursued those topics on cross-examination. Counsel asked whether she had been "intimate" with appellant and whether she "ha[d] sex with him[.]" When counsel inquired about the manner in which appellant abused Kembumbala, she replied that he had called her "dumb, fool and stupid," threatened to choke her and threatened to burn down her house. Defense counsel then challenged Kembumbala's claims, resulting in the following colloquy:

[DEFENSE COUNSEL]: So you are going together like a week or ten days and all of a sudden he's threatening you and telling you he's going to choke and burn down your house out of the blue almost?

[MS. KEMBUMBALA]: Because when I come—I work all week, sir. When I come on the weekends, I'm so tired, and *he wanted more sexually* and I couldn't concern, *and that is when the abuse and all the curses and everything would be happening, sir.*

[DEFENSE COUNSEL]: *So you are saying that sex was kind of the thing that caused the problems—*

[MS. KEMBUMBALA]: *Yes, sir.*

[DEFENSE COUNSEL]:—*because he wanted more frequency than you wanted because you were tired?*

*Is that a fair statement?*

[MS. KEMBUMBALA]: *Yes, sir.*

[DEFENSE COUNSEL]: Okay. Is that why you asked him to leave?

[MS. KEMBUMBALA]: *I asked him to leave because if somebody threaten to choke me and kill you and burn your house, too, I don't think you will want to live with them.*

(Emphasis added.)

Thereafter, defense counsel attempted to impeach Ms. Kembumbala by eliciting her admission that, before the charged assault, she had never claimed that appellant physically assaulted her.

[DEFENSE COUNSEL]: But *I've never heard you say that he hit you or touched you in any way?* You haven't said that until the 25th [sic] of May? You said he called you names and he made these threats, but *he never touched you, is that correct?*

[MS. KEMBUMBALA]: He, he almost touched me but he did not. *He tried to choke me.* When he came to choke me, he did not, sir.

[DEFENSE COUNSEL]: So you are saying he threatened you—

[MS. KEMBUMBALA]: Yes, sir.

[DEFENSE COUNSEL]:—but and *until May 25th he never touched you?* Not touched you in a wrong way when I say that. He didn't hurt you? *He didn't hurt you physically?*

[MS. KEMBUMBALA]: He pushed me, sir. *He pushed me. He held me on the floor, on the bed, sir, so that's— when he pushed me.*

[DEFENSE COUNSEL]: *And when did that happen?*

[MS. KEMBUMBALA]: It happened that Friday—that ... *Saturday before the Sunday, Sunday that I got the peace order, sir.*

[DEFENSE COUNSEL]: *But you never told anybody that even before today, did you?*

[MS. KEMBUMBALA]: *I put it in my statement when I went to get the peace order,* sir.

(Emphasis added.)

In a bench conference during the State's re-direct examination of appellant, after the prosecutor asked the trial court to reconsider its decision to exclude the statement from Kembumbala's peace order application, the following ensued:

[PROSECUTOR]: Your Honor, with regard to my motion *in limine* [before] trial, I know that you have ruled that the portion of the petition for peace order, that is the application, would not be admissible. I believe what you said was at that time—I'm going to renew my request that a portion of it be admissible because I feel at this point it is a prior consistent statement and [defense counsel] has questioned Ms. Kembumbala. Specifically, he said that she never told anybody about the injuries prior to today.

I feel that is—or about his threats and physical contact prior to today. Her answer was that she did mention it in her application for the peace order. . . .

[DEFENSE COUNSEL]: Okay. Well, it's just the same thing that she's been saying on the stand. It's that he threatened her, to burn down her house and to choke her.

THE COURT: It was a prior consistent statement and you have attacked her credibility in not reporting it previously. So I will permit it, but just the parts that has [to] do with that. . . .

[PROSECUTOR]: Thank you, Your Honor. I would agree to hold this copy at the end of today, redact it such that the only part visible is from "Mr. Robert has sexually assaulted me without my consent, was trying to choke me to death, he has threatened to burn down my house." I would just end it right there, Your Honor.

[DEFENSE COUNSEL]: And I object to it, Your Honor. (Inaudible).

THE COURT: Well, actually, what—the new information— [defense counsel] asked her if she had—what this abuse was and she said he pushed me. Has abused me, has threat-

ened—(inaudible) pushed her, held her on the bed. All right.

You have to start where, where it says "since then?"

[PROSECUTOR]: I would start, Your Honor—yes. Well, or just—or it doesn't have to be synthetic, just be Mr.—. . .

THE COURT: Mr. Robert has sexually assaulted me without my consent. He's threatened to choke me to death. He has threatened to burn down my house. And you will stop it there?

[PROSECUTOR]: Yes.

THE COURT: All right. Well, it seems to me fair since you did ask her—

[DEFENSE COUNSEL]: Yes, Your Honor.

THE COURT:—if she ever reported this before.

[DEFENSE COUNSEL]: Yes, Your Honor.

### C. Appellant's Challenge

Appellant argues that the trial court erred in admitting Kembumbala's written statement from her peace order application, because it was an extrajudicial statement offered for the truth of the matter asserted and, therefore, constituted inadmissible hearsay. In appellant's view, the statement did not qualify for admission as a prior consistent statement because "the objected-to portion of the request for the peace order was simply not inconsistent with the witness's direct examination" given that Kembumbala "had not testified to the most prejudicial allegation: 'Mr. Robert sexually assaulted me without my consent.'" Appellant contends that, if defense counsel's cross-examination opened a door, it was only "to a prior report of pushing and holding down," not to "different and more serious accusations, such as sexual assault." We disagree.

"Under Md. Rule 5–616(c)(2), a prior consistent statement is admissible to rehabilitate a witness as long as the fact that the witness has made a consistent statement detracts from the impeachment." *Holmes,* 350 Md. at 427, 712 A.2d

554. This rule applies when "the defendant's opening statement and/or cross-examination of a State's witness has 'opened the door' to evidence that is relevant (and *now* admissible) for the purpose of ... rehabilitation[.]" *Johnson v. State*, 408 Md. 204, 226, 969 A.2d 262 (2009). *See Anderson v. State*, 420 Md. 554, 567, 24 A.3d 692 (2011). These requirements were met in this instance.

 We agree with the trial court that, during cross-examination, defense counsel opened the door to the admission of this excerpt from Kembumbala's peace order application. Counsel elicited Kembumbala's testimony about her contentious sexual relationship with appellant, then asserted that she "never" said that appellant "hit [her] or touched [her] in any way" until "the 25th of May[,]" *i.e.*, the date of the altercation for which appellant was on trial. When Ms. Kembumbala responded that appellant "pushed me" and "held me on the floor, on the bed" on "Saturday before the Sunday ... that I got the peace order," defense counsel countered, "But you never told anybody that even before today, did you?" Ms. Kembumbala then replied that she "put it in my statement when I went to get the peace order[.]" Thus, Kembumbala's "credibility ha[d] been attacked" on the ground that she had never reported that appellant physically assaulted her, whether sexually or otherwise.

The transcript does not indicate that defense counsel challenged the portion of Kembumbala's statement that appellant "sexually assaulted me without my consent" as impermissible other crimes evidence or argued that it was not consistent with Kembumbala's trial testimony.[4] Even if counsel did so, it was not error to admit this portion of the statement in light of defense counsel's cross-examination challenging Kembumbala to recount whether and when she complained about any type of physical abuse. The challenged excerpt from her peace order application was consistent with Kembumbala's testimony

---

4. Although the transcript does not indicate that defense counsel lodged any objection to this portion of Kembumbala's statement, some portion of defense counsel's argument during the bench conference was inaudible.

that, before "today" at trial, and indeed, before appellant assaulted her with the tire iron, she reported physical abuse by appellant in her peace order application. Clearly, the fact that Kembumbala alleged such abuse, and that she did so before the altercation on May 25, "detract[ed] from the impeachment." Md. Rule 5–616(c)(2).

Thus, the statement was admissible under Rule 5–616(c)(2), not for its truth, but to rehabilitate Kembumbala's credibility on the critical issue of whether, as appellant claimed, she fabricated her allegations in order to exact revenge on him for ending their romantic and residential relationship. *See Holmes,* 350 Md. at 429–30, 712 A.2d 554. Although a limiting instruction would have been appropriate to advise the jury not to consider the statement for the truth of the matters asserted therein, defense counsel did not request one and the court did not abuse its discretion in failing to give one, *sua sponte. See id.* at 429, 712 A.2d 554.

■ Nor did the court abuse its discretion in failing to exclude the challenged statement under Md. Rule 5–403, permitting exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice[.]" As defense counsel acknowledged during the bench conference, the choking and burning threats described in Kembumbala's peace order application were "just the same thing that" Kembumbala had "been saying on the stand." Thus, even if the jury considered those allegations for the truth of those matters, such evidence was merely cumulative and, therefore, not unduly prejudicial. Moreover, for the reasons we have discussed, the extensive cross-examination regarding whether Kembumbala reported any type of physical abuse fairly opened the door for admission of Kembumbala's prior consistent statement alleging physical and sexual abuse.

## III

### Exclusion of Appellant's Testimony Regarding Kembumbala's Threat

In his final assignment of error, appellant complains that the trial court erred in excluding evidence that Kembumbala

threatened to harm him. On direct examination, appellant testified that, on Sunday, May 25, before Kembumbala obtained the peace order, he told her that he planned to move out. Defense counsel then inquired as follows:

[DEFENSE COUNSEL]: What happened as a result of your telling Ms. Kembumbala you wanted to leave?

[APPELLANT]: I moved back to my rented place and still had that for the few days I'll be there, I wanted to stay as landlord—landlady and tenant, and *it was like if she is going to lose me, nobody is going to get me.*

[PROSECUTOR]: Objection, Your Honor.

THE COURT: Objection sustained.

(Emphasis added.)

Appellant argues that the trial court erroneously sustained the prosecutor's general objection "on apparent hearsay grounds," because Kembumbala's extrajudicial statement "was offered for the nonhearsay purpose of corroborating [a]ppellant's theory of the case." According to appellant, Kembumbala's threat that "nobody is going to get" appellant "if she is going to lose" him, was offered, not for its truth, but rather as corroboration of appellant's theory that "Allen had attacked him (presumably at her urging)," to counter the State's claim that appellant was the initial aggressor.

We agree with the State that appellant has mischaracterized the challenged testimony as an extrajudicial statement and mischaracterized the trial court's ruling as a decision to exclude the testimony on hearsay grounds. Appellant did not testify that Kembumbala made such a statement. Nor did defense counsel proffer that Kembumbala verbally threatened appellant or argue that appellant's testimony should be admitted as nonhearsay. In the absence of any mention of hearsay, the trial court did not err in construing appellant's testimony as merely an expression of his own speculative belief that Kembumbala's motive in obtaining the peace order was to seek revenge for appellant's decision to end their relationship and his tenancy.

JUDGMENTS OF CONVICTION FOR VIOLATING A PEACE ORDER AND SECOND–DEGREE ASSAULT AFFIRMED; SENTENCE FOR VIOLATING A PEACE ORDER VACATED.

COSTS TO BE PAID BY ONE–THIRD [1/3] BY BALTIMORE COUNTY, TWO–THIRDS [2/3] BY APPELLANT.