REPORTED

IN THE COURT OF SPECIAL APPEALS

 OF MARYLAND

No. 2291

September Term, 2013

_____

KWAKU WIREDU

v.

STATE OF MARYLAND

_____

Berger,
Nazarian,
Leahy,

JJ.

_____

Opinion by Nazarian, J.

_____

Filed: April 2, 2015

After injuring James Poleto in a car accident while impaired by alcohol, Kwaku Wiredu was charged and convicted in the Circuit Court for Baltimore City of a number of reckless driving charges, as well as second-degree assault, indecent exposure, and public urination. On appeal, Mr. Wiredu argues that the circuit court erred in instructing the jury as to second-degree assault and in imposing an improper sentence. We affirm Mr. Wiredu's convictions, but we agree that two elements of his sentences require correction, and we vacate in part and remand for further (limited) proceedings for that purpose.

## I. BACKGROUND

On June 29, 2012, Mr. Wiredu, a private duty nurse and a certified medical technician, went to a friend's house to deliver some items he had obtained during a recent trip to Africa. Mr. Wiredu said that he drank a tall can of beer and part of another while he was at his friend's house. It was windy and raining—a surprise *derecho* had hit the state that night—so Mr. Wiredu decided to stay at his friend's house until the storm died down. At approximately 1:00 a.m., Mr. Wiredu drove home after his wife called and said she was scared because a tree had fallen in the driveway and the lights had gone out.

Mr. Wiredu drove toward home on Harford Road, a four-lane road with two northbound lanes and two southbound lanes. Mr. Wiredu was driving in the left southbound lane, the lane closest to the center line, when he observed a motorist operating a motorcycle in the left northbound lane. According to Officer Ralph Horton, who was driving behind the motorcycle, Mr. Wiredu's silver truck "merged" into the motorcycle's lane and collided head-on with the motorcycle, which was being driven by Mr. Poleto. Mr.

Wiredu testified that the collision was the product of the motorcycle "swerving" into his lane. Officer Horton's version of the accident was corroborated by Matthew Wright, a Baltimore City firefighter and EMT who also witnessed the accident.

As a result of the accident, Mr. Poleto landed near the curb on his back, approximately thirty feet from his motorcycle. After caring for Mr. Poleto, Officer Horton noticed that Mr. Wiredu had "slow speech . . . [and] couldn't really talk[;] [h]e was falling, like he couldn't stand up; eyes [were] glossy and red[;] [h]e had a strong [scent] of alcohol coming out of his mouth." Mr. Wright observed that Mr. Wiredu's breath "smelled of alcohol." Mr. Wright then watched as Mr. Wiredu exited his vehicle and "pulled out his privates" to urinate on Harford Road. Based on these observations, Officer Horton gave Mr. Wiredu an opportunity to take a field sobriety test, but Mr. Wiredu declined. Officer Horton then arrested Mr. Wiredu for driving under the influence of alcohol and took him to the police station, where Mr. Wiredu refused to take a Breathalyzer test.

Mr. Wiredu was charged with second-degree assault, causing a life-threatening injury by motor vehicle while under the influence of alcohol, causing a life-threatening injury by motor vehicle while impaired by alcohol, indecent exposure, public urination, driving while under the influence of alcohol, driving while impaired by alcohol, failure to drive right of the center lane, and negligent driving. After a jury trial, Mr. Wiredu was acquitted of causing a life-threatening injury by motor vehicle while under the influence of

alcohol, but convicted of the remaining charges.[1]  The circuit court, on December 2, 2013, sentenced Mr. Wiredu to ten years, all but two years suspended, for second-degree assault, to a consecutive three years for the indecent exposure, to a consecutive two years for causing a life threatening injury to another while impaired, and to a concurrent ten days for public urination.  In addition, the circuit court ordered Mr. Wiredu to pay $155,672 in restitution, including $60,000 in lost wages for Ms. Poleto, who gave up her job to provide care for her husband.  This timely appeal followed.

## II. DISCUSSION

Mr. Wiredu raises three arguments on appeal.  *First*, he argues that his sentence for second-degree assault must be vacated because, under the rule of lenity, second-degree assault merges with causing a life-threatening injury to another by motor vehicle while impaired by alcohol for sentencing purposes, because both convictions arose from the same car collision involving the same victim.  *Second*, he claims that the circuit court's instruction to the jury with respect to second-degree assault was deficient. *Finally*, he contends that the circuit court erred in ordering him to pay restitution for *Ms. Poleto's* lost wages because the circuit court was only permitted to order restitution for *Mr. Poleto's* lost wages.[2]  We find that his first and third arguments have merit, but that his second was not preserved.

---

[1] Pursuant to the circuit court's instructions, the jury did not return a verdict with respect to driving while under the influence of alcohol or driving while impaired by alcohol.
[2] Mr. Wiredu presents the following questions for our review:

**A.** **Mr. Wiredu's Sentence For Causing a Life-Threatening Injury By Motor Vehicle While Impaired By Alcohol Should Have Merged Into His Sentence For Second-Degree Assault.**

Citing the rule of lenity, Mr. Wiredu asserts that the circuit court erred by sentencing him separately for second-degree assault and for causing a life-threatening injury by motor vehicle while impaired by alcohol. In his view, the two offenses should merge because they "are not based on different criminal behavior." The State argues that separate crimes occurred, that Mr. Wiredu committed second-degree assault "when he crossed the center line and struck Mr. Poleto's motorcycle in a head-on collision" and his driving while impaired offense "subsumed his entire night: [Mr.] Wiredu drinking earlier that evening; [Mr.] Wiredu deciding to drive; [Mr.] Wiredu negligently causing the accident; [Mr.] Wiredu demonstrating he was under the influence." We agree with Mr. Wiredu that both offenses arise out of the same criminal behavior. And because the Legislature did not express the discernible intent to impose separate punishments for these crimes, the rule of lenity compels us to resolve the doubt in Mr. Wiredu's favor.

---

1. Must Mr. Wiredu's sentence for second-degree assault be vacated under the rule of lenity?

2. Did the trial court commit plain error when it instructed the jury on second degree assault?

3. Did the trial court impose an illegal sentence when it ordered Mr. Wiredu to pay restitution, a portion of which included compensation for the victim's wife's lost wages?

4

"[T]he usual rule for deciding whether one criminal offense merges into another or whether one is a lesser included offense of the other, . . . when both offenses are based on the same act or acts, is the so-called 'required evidence test.'" *State v. Lancaster*, 332 Md. 385, 391 (1993) (citations omitted). This test compares the elements of the two crimes:

> The required evidence test focuses upon the elements of each offense; if all of the elements of one offense are included in the other offense, so that only the latter offense contains a distinct element or distinct elements, the former merges into the latter. Stated another way, the required evidence is that which is minimally necessary to secure a conviction for each offense. If each offense requires proof of a fact which the other does not, or in other words, if each offense contains an element which the other does not, there is no merger under the required evidence test even though both offenses are based upon the same act or acts. But, where only one offense requires proof of an additional fact, so that all elements of one offense are present in the other, and where both offenses are based on the same act or acts, . . . merger follows.

*Id.* at 391-92 (citations and quotations omitted).

Here, the parties agree, and so do we, that the two crimes do not merge under the required evidence test. "Second-degree assault is a statutory crime that encompasses the common law crimes of assault, battery, and assault and battery." *Quansah v. State*, 207 Md. App. 636, 646 (2012), *cert. denied*, 430 Md. 13 (2013); *see also* Md. Code (2002, 2012 Repl. Vol.), § 3-203(a) of the Criminal Law Article ("CL") ("A person may not commit an assault."); CL § 3-201(b) (defining "assault" to mean "the crimes of assault, battery, and assault and battery, which retain their judicially determined meanings"). Mr. Wiredu was charged with the unintentional battery form of second-degree assault, which

requires the State to prove (1) contact with another; (2) which is the result of criminal negligence; and (3) that causes an injury. *See Elias v. State*, 339 Md. 169, 184 (1995) ("An unintentional battery can arise from contact that is the result of a person's criminal negligence that legally causes injury to another.").

Mr. Wiredu was also charged with causing a life-threatening injury to another by motor vehicle while impaired by alcohol. *See* CL § 3-211(d)(1). That charge required the State to prove (1) negligent driving; (2) while impaired by alcohol; and (3) that causes a life-threatening injury to another. *See* CL § 3-211(d)(1). Because Mr. Wiredu's second-degree assault conviction required proof of criminal negligence, which is not required for a conviction under CL § 3-211(d)(1), and because his conviction under CL § 3-211(d)(1) required proof of negligent driving, which is not required for a second-degree assault conviction, we agree with the parties that the two offenses are not merged under the required evidence test. *See Walker v. State*, 53 Md. App. 171, 200 (1982) ("Each crime has a required element which the other does not. They are clearly not 'the same offense.'" (citations omitted)).

This does not end the merger inquiry, however:

> [E]ven though offenses may be separate and distinct under the required evidence test, courts occasionally find as a matter of statutory interpretation that the Legislature did not intend, under the circumstances involved, that a person could be convicted of two particular offenses growing out of the same act or transaction.

6

*Brooks v. State*, 284 Md. 416, 423 (1979); *see also Jones v. State*, 357 Md. 141, 156 (1999) ("Under the Double Jeopardy Clause, a defendant is protected against multiple punishment for the same conduct, unless the legislature clearly intended to impose multiple punishments."). When two statutory crimes arise out of the same act,

> [i]t is purely a question of reading legislative intent. If the Legislature intended two crimes arising out of a single act to be punished separately, we defer to that legislated choice. If the Legislature intended but a single punishment, we defer to that legislated choice. If we are uncertain as to what the Legislature intended, we turn to the so-called "Rule of Lenity," by which we give the defendant the benefit of the doubt.

*Walker*, 53 Md. App. at 201 (citations omitted). Accordingly, we undertake a two-step analysis to determine whether to merge two offenses under the rule of lenity: (1) *first*, we ask whether the two offenses arise out of the same criminal conduct; and (2) *second*, we ask whether the Legislature has expressed an intention to impose multiple punishments.

The State urges us to find that the two offenses did not arise out of the same criminal conduct, that Mr. Wiredu committed a second-degree assault when he inadvertently merged his vehicle into Mr. Poleto's lane and struck Mr. Poleto's motorcycle in a head-on collision, and that he committed a violation of CL § 3-211(d)(1) when he (1) consumed alcohol; (2) decided to drive; *and then* (3) negligently caused the head-on collision with Mr. Poleto. In the State's view, the second-degree assault arises out of the accident itself while the CL § 3-211(d)(1) conviction arises out of Mr. Wiredu's conduct from the entire night.

7

We disagree. The unintentional battery form of second-degree assault with which Mr. Wiredu was charged requires more than *ordinary* negligence—it requires *criminal* negligence. *See Elias*, 339 Md. at 184. "[W]hether a defendant's actions constitute gross criminal negligence/recklessness turns on whether those actions under all the circumstances amounted to a *disregard of the consequences which might ensue to others*." *Id.* (emphasis added). As such, Mr. Wiredu's second-degree assault conviction did not arise when he caused a head-on collision with Mr. Poleto, but rather when he caused the collision *after he elected to drive while impaired by alcohol*. It was Mr. Wiredu's decision to drive while impaired by alcohol that "amounted to a disregard of the consequences which might ensue to others," which ultimately constituted the criminal negligence necessary to support a second-degree assault conviction. *See id.* If, as the State contends, Mr. Wiredu committed a second-degree assault by negligently causing the collision, every individual involved in a negligent car accident would face prosecution for second-degree assault. We find, therefore, that the two offenses arose out of the same conduct, *i.e.*, Mr. Wiredu's decision to drive while impaired by alcohol and negligently causing a car accident that injured Mr. Poleto. *See Quansah*, 207 Md. App. at 653 (holding that a second-degree assault conviction arose out of the same criminal conduct as a violation of a peace order conviction where the defendant visited his former lover's residence, in violation of a peace order, and then physically assaulted her); *Walker*, 53 Md. App. at 201-02 (rejecting argument that the jury convicted the accused of a single count of assault and another count of attempted rape based on separate acts that occurred during a single criminal episode).

This takes us to the question of whether the Legislature expressed an intention to have multiple punishments or a single punishment for these offenses. The State argues that legislative silence bespeaks (if tacitly) an intention to punish separately, that "when two separate criminal statutes create separate offenses based on different criminal behavior with different criminal consequences, and there is no relevant legislative history suggesting that the Legislature intended to prohibit the imposition of separate sentences for the two separate crimes, the rule of lenity does not apply." *Fenwick v. State*, 135 Md. App. 167, 174-75 (2000). But that presumption does not apply where, as we have found here, the two crimes arose from the same conduct. *See Quansah*, 207 Md. App. at 655-56 (rejecting the State's reliance on *Fenwick* because the defendant's "two sentences punish[ed] him for the same 'criminal behavior'"). We have reviewed the relevant legislative history for evidence of affirmative intent, and we find nothing that indicates that the Legislature intended to authorize multiple punishments for a second-degree assault and a CL § 3-211(d)(1) violation based on a single traffic accident. Under these circumstances, when "we are uncertain as to what the Legislature intended, we turn to the . . . 'Rule of Lenity' by which we give the defendant the benefit of the doubt." *Walker*, 53 Md. App. at 201; *see also Quansah*, 207 Md. App. at 656. Accordingly, we hold that Mr. Wiredu's sentence for violating CL § 3-211(d)(1) must be merged into his ten-year sentence for second-degree assault. *See generally Abeokuto v. State*, 391 Md. 289, 356 (2006) ("the offense carrying the lesser maximum penalty ordinarily merges into the offense carrying the greater

9

maximum penalty" (citation omitted)), and so we vacate that sentence and remand for resentencing in that regard.[3]

**B.   Mr. Wiredu Did Not Preserve His Argument That The Circuit Court Erred When It Instructed The Jury On Second-Degree Assault.**

Mr. Wiredu next challenges the circuit court's instruction to the jury on second-degree assault:

> The Defendant is charged with the crime of second degree assault. Second degree assault is causing offensive physical contact to another person. In order to convict the Defendant of assault, the State must prove one, Defendant caused offensive physical conduct with physical harm to Mr. Poleto.
>
> Two, the contact was the result of an intentional [or] a reckless act of the Defendant and was not accidental and the contact was not legally justified. Second degree assault is sometimes called a criminal battery, and it may be intentional or unintentional.
>
> An unintentional battery can arise from the contact that is the result of a person's criminal negligence that legally causes injury to another. A criminal battery is committed if the contact was the result of the Defendant's recklessness or criminal negligence.

---

[3] In his brief, Mr. Wiredu acknowledges that "[t]ypically, when offenses merge under the rule of lenity, the court vacates the sentence for the crime that carries the lesser penalty," but he nonetheless argues that we should vacate his second-degree assault conviction because "he would still be subject to the ten-year sentence the court imposed for second-degree assault, which is far more time than he could have been subjected to if Mr. [Poleto] had died." However, as Mr. Wiredu later conceded in his reply brief, "[h]ad Mr. Poleto died and Mr. Wiredu been convicted of vehicular manslaughter, he, admittedly, could have received a ten-year sentence," the same sentence he received from the circuit court for second-degree assault. *See* CL § 2-209(d).

10

> Whether a Defendant's actions constitute criminal negligence or recklessness [turns] on whether those actions under all the circumstances amounted to a disregard of the consequences which might ensue to others.

Mr. Wiredu claims that this instruction was inadequate because "it failed to even utilize the term gross negligence" and "failed to accurately define what level of negligence the jury was required to find before it could convict [him] of second-degree assault." However, after the circuit court instructed the jury on second-degree assault, the court asked Mr. Wiredu's counsel if he had any objections to the instructions, and counsel replied: "No, Judge." By lodging no objection, Mr. Wiredu failed to preserve his objection to the circuit court's instruction to the jury. *See* Md. Rule 4-325(e) ("No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection."); *Alston v. State*, 414 Md. 92, 111 (2010) ("Countless opinions of this Court have held that, when no timely objection to the jury instructions is made in the trial court, this Court ordinarily will not review a claim of error based on those instructions."); *see also State v. Rich*, 415 Md. 567, 574 (2010) (The "rules for preservation of issues have a salutary purpose of preventing unfairness and requiring that all issues be raised in and decided by the trial court, and these rules must be followed in all cases." (citations omitted)).

We acknowledge that "we have discretion under Md. Rule 4–325(e) to address an unpreserved issue." *Yates v. State*, 202 Md. App. 700, 720 (2011), *aff'd,* 429 Md. 112

(2012); Md. Rule 4-325(e) ("An appellate court, on its own initiative or on the suggestion

of a party, may however take cognizance of any plain error in the instructions, material to

the rights of the defendant, despite a failure to object.").  But as the Court of Appeals has

explained, this discretion should rarely be exercised:

> It is a discretion that appellate courts should rarely exercise, as considerations of both fairness and judicial efficiency ordinarily require that all challenges that a party desires to make to a trial court's ruling, action, or conduct be presented in the first instance to the trial court so that (1) a proper record can be made with respect to the challenge, and (2) the other parties and the trial judge are given an opportunity to consider and respond to the challenge.

*Chaney v. State*, 397 Md. 460, 468 (2007); *see also Kelly v. State*, 195 Md. App. 403, 432

(2010) ("[A]ppellate review under the plain error doctrine 1) always has been, 2) still is,

and 3) will continue to be a rare, rare phenomenon." (citations omitted)).

We decline to exercise our discretion to undertake plain error review of this jury

instruction.  Among other reasons why this case does not compel this extraordinary

remedy, the instruction at issue came directly from the Maryland Pattern Jury Instructions,

MPJI-CR § 4:01(C), a fact that weighs heavily against the possibility of plain error review:

> We note that the instruction that the court gave was MPJI–CR 4.17.7.2(B).  Although the use of a pattern jury instruction does not insulate a conviction against review, it is a factor in our analysis.  This Court has recommended that trial judges use the pattern instructions. *See Minger v. State*, 157 Md. App. 157, 161 n. 1 (2004) ("Appellate courts in Maryland strongly favor the use of pattern jury instructions"); *Green v. State*, 127 Md. App. 758, 771 (1999) (recommending that trial judges give pattern jury instructions).  Appellant has not cited any case in which a Maryland appellate court has held that a trial court

12

committed plain error in following this recommendation and giving, without objection, a pattern jury instruction.

Other courts have listed the use of a pattern jury instruction as a factor weighing against plain error review. *United States v. Roach*, 502 F.3d 425, 439 (6th Cir. 2007) ("We generally prefer the usage of the Sixth Circuit pattern jury instruction and 'its use will, in most instances, insulate a resulting verdict' from challenge on appeal.") (quoting *United States v. Clinton*, 338 F.3d 483, 488 (6th Cir. 2003)); *United States v. Reff*, 479 F.3d 396, 402 (5th Cir. 2007) ("We previously have stated that the use of an unobjected-to pattern jury instruction rarely will rise to the level of plain error."); *Price v. State*, 725 So.2d 1003, 1058 (Ala. Crim. App. 1997) ("A trial court's following of an accepted pattern jury instruction weighs heavily against any finding of plain error."), *aff'd*, 725 So.2d 1063 (Ala.1998).

We agree and hold that the circuit court's use of a pattern jury instruction, without objection, weighs heavily against plain error review of the instructions given. We decline to exercise our discretion to engage in plain error review in this case.

*Yates*, 202 Md. App. at 723-24. We struggle, therefore, to see an error, let alone plain error, that justifies the exercise of discretion to overlook the absence of an objection at trial.

### C.    The Circuit Court Abused Its Discretion In Ordering Mr. Wiredu To Pay Restitution For Ms. Poleto's Lost Wages.

*Finally*, Mr. Wiredu contends that the circuit court erred in ordering him to pay restitution for Ms. Poleto's lost wages. Before the sentencing hearing, the State prepared a pre-sentence investigation report that included a detailed line-by-line breakdown of the expenses Mr. Poleto incurred after Mr. Wiredu hit him (the emphases are ours):

2012 Medical (2200 miles in traveling back & forth to hospitals, doctor appts., etc.)

$252 in parking for medical treatment

13

$4,822.11 in medical supplies, etc.
$1,200.00 in medical safety equipment (ramp on house, safety bars in bath)(on Jan cc statement)
$3,120.54-Johns Hopkins Bill
$15,569.10-Johns Hopkins Bill

$1,674.94-Levindale Bill
$26,638.69-Total (not including any compensation for miles)

Lost Wages for 2012
[Mr. Poleto]-$15,000 (7/1/12-12/31/12)
*[Ms. Poleto]-$20,000 (7/1/12-12/31/12)*

2013 Medical (to date): (4490 miles traveling back & forth to hospitals, doctors, etc.)

$4,204.70-medical bills
$458.67-Medical Supplies, etc. (January)
$815.71-Medical Supplies, etc. (February)
$943.07-Medical Supplies, etc. (March)
$219.26-Medical Supplies, etc. (April)
$217.54-Medical Supplies, etc. (May)
$272.79-Medical Supplies, etc. (June)
$546.54-Medical Supplies, etc. (July)
$254.95-Medical Supplies, etc. (August)
$273.15-Medical Supplies, etc. (September)
$231.25-Medical Supplies, etc. (October)
$400.03-Medical Supplies, etc. (November)
$182.22-Medical Supplies, etc. (December so far)
$16,550.00-PT intensive therapy program in Alabama (October 2013)
$3,525.00-SLP intensive therapy program in NJ (September 2013)
$800.00-Out of Pocket PT home therapy- (so far)
$139.20-parking and food at hospitals
$30,034.18-Total (not including any compensation for miles)

Lost wages for 2013
[Mr. Poleto]-$24,000 (1/1/13-12/31/13)
*[Ms. Poleto]-$40,000 (1/1/13-12/31/13)*

14

TOTAL MEDICAL TO DATE: $56,672.87
TOTAL LOST WAGES ([Mr. Poleto]): $39,000.00
*TOTAL LOST WAGES ([Ms. Poleto]): $60,000*

The State submitted this expense summary to the circuit court in support of its request for an order of restitution, and the circuit court grounded its decision to order restitution in the specific requests:

> I'm going to first approach the question of restitution. But, I don't – I see there are – well, I'm looking at the paper that I was given, and it's not clear, because there's different figures and different categories.
>
> What is – what amount of restitution are you seeking? Because there's – they seem to overlap, or – oh, you said total medicals to date, $56,000. Total lost wages – okay.
>
> \* \* \*
>
> So, that's $99,000 and 56. It's $155,672; which I don't think would be realistic to believe that it would be recovered, unless that someday Mr. Wiredu invents some great invention or wins the lottery or something. Stand up, Mr. Wiredu.
>
> \* \* \*
>
> [Mr.] Wiredu. I will render judgment in the amount that I stated against you; $155,672.

Mr. Wiredu challenges only the portion of the circuit court's award of restitution that included Ms. Poleto's lost wages.

Restitution in criminal cases is governed by Md. Code (2001, 2008 Repl. Vol.), § 11-603 of the Criminal Procedure Article ("CP"), which ties restitution to the *victim's* injuries and losses:

15

(a) A court may enter a judgment of restitution that orders a defendant or child respondent to make restitution in addition to any other penalty for the commission of a crime or delinquent act, if:

(1) as a direct result of the crime or delinquent act, property of the victim was stolen, damaged, destroyed, converted, or unlawfully obtained, or its value substantially decreased;

(2) as a direct result of the crime or delinquent act, the victim suffered:

(i) actual medical, dental, hospital, counseling, funeral, or burial expenses or losses;

(ii) direct out-of-pocket loss;

(iii) loss of earnings; or

(iv) expenses incurred with rehabilitation;

(3) the victim incurred medical expenses that were paid by the Department of Health and Mental Hygiene or any other governmental unit;

(4) a governmental unit incurred expenses in removing, towing, transporting, preserving, storing, selling, or destroying an abandoned vehicle as defined in § 25-201 of the Transportation Article;

(5) the Criminal Injuries Compensation Board paid benefits to a victim; or

(6) the Department of Health and Mental Hygiene or other governmental unit paid expenses incurred under Subtitle 1, Part II of this title.

The decision to order restitution pursuant to CP § 11-603 and the amount lie within the trial court's sound discretion and we review the trial court's decision on the abuse of

16

discretion standard. *See Silver v. State*, 420 Md. 415, 427 (2011). But "when a sentencing court exceeds the limits of its statutory authority in ordering restitution[,] . . . we will vacate the order as an illegal sentence." *Stachowski v. State*, 213 Md. App. 1, 13-14 (2013), *rev'd on other grounds*, 440 Md. 504 (2014); *Walczak v. State*, 302 Md. 422, 427-30 (1985); *Carter v. State*, 193 Md. App. 193, 209 (2010).[4]

We are constrained to agree with Mr. Wiredu that the circuit court abused its discretion in awarding restitution of Ms. Poleto's lost wages. CP § 11-603 authorizes the circuit court to award restitution for the loss of earnings that "as a direct result of the crime or delinquent act, the *victim* suffered." CP § 11-603(2)(iii) (emphasis added). And as both parties acknowledge, CP § 11-603 does not authorize a circuit court to award restitution for the lost earnings of others.

The State asks us to recharacterize the $60,000 in restitution for Ms. Poleto's lost wages as "actual medical . . . expenses or losses" and/or "expenses incurred with rehabilitation," which could be measured by the earnings Ms. Poleto lost while caring for her husband. The statute does allow recovery for "actual medical, dental, hospital, counseling, funeral, or burial expenses or losses," CP § 11-603(a)(2)(i), or "expenses incurred with rehabilitation." *Id*., (a)(2)(iv). But those are not what the State sought in the

---

[4] Mr. Wiredu did not object to the restitution order when he was before the circuit court, but to the extent a restitution order qualifies as an illegal sentence, appellate review is not precluded. *See Walczak*, 302 Md. at 425-27 (rejecting "the State's argument that the defendant's failure to object to the restitution order precluded review on direct appeal").

17

circuit court. The summary of the expenses Mr. Poleto incurred, which it documented in preparation for the sentencing hearing, separated Mr. Poleto's medical expenses from the loss of earnings he and his wife incurred. At the bottom of the summary, the State listed Mr. Poleto's total medical expenses as $56,672.88, Mr. Poleto's lost wages as $39,000.00, and Ms. Poleto's lost wages as $60,000; in the breakdowns for each calendar year, her lost wages and his were detailed separately. The State asked for, and the circuit court awarded, medical expenses of $56,672.88 (which did not include any money for Ms. Poleto's lost wages), and total lost wages of $99,000 ($39,000 for Mr. Poleto's lost wages and $60,000 for his wife's). The circuit court awarded restitution as requested, and *did not* treat Ms. Poleto's lost earnings as a part of Mr. Poleto's medical expenses.

It would not be appropriate for us to recast on appeal the State's request and the circuit court's characterization of the restitution award. The record leads inexorably to the conclusion that the circuit court awarded restitution for Ms. Poleto's lost earnings as the State requested, an award that exceeded the court's authority under CP § 11-603. *See Addison v. State*, 191 Md. App. 159, 183 (2010) ("Since we conclude that [CP] § 11–603(a) does not authorize a court to order restitution for a victim's pain and suffering, appellant's sentence was illegal."). Accordingly, we vacate the portion of the circuit court's restitution order requiring Mr. Wiredu to pay $60,000 for Ms. Poleto's lost wages and remand for entry of a corrected restitution award.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED IN PART, VACATED IN PART AND REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID 50% BY APPELLANT AND 50% BY MAYOR AND CITY COUNCIL OF BALTIMORE.**

19