NOTICE

*The text of this opinion can be corrected before the opinion is published in the* <u>*Pacific Reporter*</u>. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

BRENNAN ADAM GRUBB,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-13074
Trial Court No. 3AN-14-09600 CR

O P I N I O N

No. 2722 — February 25, 2022

Appeal from the Superior Court, Third Judicial District, Anchorage, Michael L. Wolverton, Judge.

Appearances: Renee McFarland, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for the Appellant. Donald Soderstrom, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, and Wollenberg and Terrell, Judges.

Judge WOLLENBERG.

Brennan Adam Grubb pleaded guilty to one count of second-degree sexual abuse of a minor after a series of incidents involving nine-year-old M.M. The superior court ordered Grubb to pay $216,307.55 in restitution, the majority of which

compensated M.M.'s mother, T.R., for future lost wages and benefits after she resigned from her job as a public school teacher to care for M.M.

Grubb challenges, on a number of grounds, the portion of the restitution judgment awarding future lost wages and benefits. Principally, he contends that his criminal conduct was not the proximate cause of T.R.'s future lost wages and benefits. Stated differently, he asserts that T.R.'s losses resulted from a number of discretionary decisions that T.R. made and are therefore too attenuated from his criminal conduct to be compensable.

Because Alaska law establishes that the lost wages and benefits incurred under the circumstances of this case are not recoverable in a civil suit, and because restitution is not intended to allow for greater recovery in a criminal case than a victim would otherwise be entitled to recover under tort law, we conclude that the challenged portion of the restitution order awarding future lost wages and benefits must be vacated.

*Underlying facts and proceedings*

In October 2014, Brennan Grubb was charged with five counts of attempted first-degree sexual abuse of a minor for engaging in multiple sexual acts with nine-year-old M.M.[1] Grubb, who was sixteen years old at the time of the offenses, was automatically charged as an adult pursuant to AS 47.12.030.

Pursuant to an agreement with the State, Grubb ultimately pleaded guilty to a single count of second-degree sexual abuse of a minor.[2] The court sentenced him to 30 years with 20 years suspended (10 years to serve) and a 10-year term of probation.

---

[1] AS 11.41.434(a)(1) & AS 11.31.100.

[2] AS 11.41.436(a)(2).

As part of his plea agreement, Grubb also agreed to pay restitution in an amount to be determined by the court within ninety days of sentencing.

Almost a year later, after two extension requests, the State submitted a proposed restitution judgment of $20,700.35 — which included reimbursement of approximately $9,000 to the State of Alaska Violent Crimes Compensation Board for payments to T.R., as well as restitution of approximately $11,000 to T.R. for the installation and maintenance of a security system at her home and M.M.'s future counseling costs. Grubb's attorney filed a partial objection to the proposal, asserting that portions of it were too speculative or not compensable in restitution. The attorney also requested an evidentiary hearing.

Prior to the hearing, the State filed an amended proposal, increasing its request from just over $20,000 to a total of $216,307.55. This amount included the restitution previously sought as reimbursement to the Violent Crimes Compensation Board ($6,575.43 of which compensated T.R. for her salary lost to date, as she had scaled back her teaching responsibilities to care for M.M. during the 2014-15 school year), as well as restitution to T.R. for the home security system ($5,233.04), M.M.'s past counseling costs ($2,364), and a portion of T.R.'s past lost wages that had not been compensated by the Violent Crimes Compensation Board. The State no longer sought restitution for M.M.'s future counseling costs.

The bulk of the amended proposal — $197,038 — was related to a new request for T.R.'s *future* lost wages and benefits: $52,144 for T.R.'s estimated diminished future salary and $144,894 for T.R.'s corresponding diminished retirement benefits. Included with the proposed judgment was a document prepared by T.R. outlining how she had calculated her future losses.

At the evidentiary hearing, T.R. testified that she resigned from her position as a public school teacher at the end of the 2014-15 school year, after sixteen years of

service, so that she could better support M.M.  T.R. testified that, following the abuse, M.M. was diagnosed with post-traumatic stress disorder, had trouble feeling safe at home, and struggled with school.  M.M.'s needs were time-consuming, and T.R. explained that attending to them often disrupted her teaching and caused her to be late for work.  After being reprimanded for tardiness by her supervisor, T.R. ultimately felt unable to balance M.M.'s needs with her teaching responsibilities and her own well-being.  Although T.R. could have taken a leave of absence instead of resigning, she explained why she chose not to do so:  she was told that district policies prohibited her from pursuing her part-time job as a realtor while on leave, and she would have had no control over the time frame of her return or the position to which she returned.

T.R. stated that, at the time of her resignation, she had planned to teach for at least four more years, as she would be eligible for basic retirement after twenty years of service.  According to T.R., her resignation impacted her progress along the school district's salary scale, which in turn affected the amount of her retirement benefits.  If she returned to teaching, she would receive some credit for her previous experience, but she would not be restored to her former pay grade.

T.R. testified that she calculated the amount she was requesting for future lost wages — $52,144 — by estimating the difference between what she believed she would have earned over a four-year period if she had not resigned, and what she believed she would earn over a four-year period if she returned to teaching at a reduced salary and received a 2.5 percent pay raise each year thereafter.[3]  As for her retirement benefits, T.R.

---

[3]  T.R. testified that she used "the most recent contract" that she found online to estimate her projected base salary upon return.  T.R. explained that she anticipated an annual raise of 2.5 percent based on information she received from the Anchorage Education Association about the average annual salary increase, although she acknowledged that the pay scale was sometimes frozen in place.

testified that, had she continued teaching, she would have been able to retire at age forty-two, and — based on her estimate that women in Alaska have an average life expectancy of eighty years — she calculated that she "could be losing out on as much as $144,894 over [her] lifetime."

On cross-examination, T.R. explained why she believed that Grubb should pay her restitution for lost wages and benefits, stating, "I can say with 100 percent certainty that I left teaching because of Mr. Grubb's actions." But she acknowledged that nobody forced her to resign and that she had the option of taking a leave of absence to care for M.M. instead of resigning.[4]

At the time of the hearing, T.R. felt that M.M. had improved enough for her to return to teaching. She had applied for a position but, because the school district was experiencing layoffs, she did not receive an interview.

Grubb's attorney opposed the amended proposal on numerous grounds. He argued, *inter alia*, that Grubb's conduct was not the proximate cause of T.R.'s future losses and that her future losses were too speculative to be compensable.

The superior court rejected Grubb's challenges and, crediting T.R.'s calculations and testimony, entered a judgment of restitution in the full amount requested by the State.

Grubb now appeals.

---

[4] T.R. testified that she had a shared custody arrangement with M.M.'s father such that they alternated weeks of having M.M. in their care. According to T.R., M.M. continued attending school after the incident with Grubb and was never home-schooled. After T.R. resigned from her teaching position, T.R. made herself available to M.M. as needed; for example, she would have lunch with him and "tried to spend a lot of time in [his] classroom."

*Why we vacate the restitution judgment and remand for entry of an amended judgment that does not include T.R.'s estimated future wage and benefit losses*

On appeal, Grubb raises a number of challenges to the portion of the restitution judgment awarding $197,038 to T.R. for her future lost salary and benefits.

Chief among Grubb's challenges to T.R.'s lost wages and benefits are Grubb's contentions that these losses were too speculative to be compensable — and that, although the trial court could properly find that Grubb's conduct was the "but for" cause of T.R.'s losses, the trial court failed to properly evaluate whether Grubb's criminal conduct was the legal cause (*i.e.*, the proximate cause) of the particular losses challenged. Grubb also argues that the trial court failed to consider whether the award to T.R. for future losses should be offset by the mitigating effect of T.R.'s real estate earnings and reduced to present value. Finally, Grubb asserts that, in the event T.R.'s future lost wages and benefits are validly subject to a restitution order under state law, this portion of the restitution judgment violates the prohibition on excessive fines under the United States and Alaska Constitutions.[5]

Alaska's restitution statutes provide that, unless a victim declines restitution, a court shall order restitution for the actual damages or loss caused by the conduct for which the defendant was convicted.[6] In particular, AS 12.55.045(a) authorizes restitution, as a direct component of a sentence, "to the victim or other person

_____

[5] U.S. Const. amend. VIII; Alaska Const. art. I, § 12.

[6] *See* AS 12.55.045; *Welsh v. State*, 314 P.3d 566, 567-68 (Alaska App. 2013) (recognizing that, under Alaska's restitution statutes, restitution "should be assessed according to the damages or loss arising from the defendant's crime"); *see also Peterson v. Anchorage*, 500 P.3d 314, 317 (Alaska App. 2021) (reversing restitution judgment because of the absence of "any indication in the record that the losses were caused by [defendant]'s criminal conduct, as opposed to her negligence").

injured by the offense[.]"[7]  And AS 12.55.100(a)(2)(B) authorizes restitution, as a condition of probation, "to aggrieved parties for actual damages or loss caused by the crime for which conviction was had[.]"[8]

The purpose of the restitution statutes is to "make full restitution available to all persons who have been injured as a result of criminal behavior, to the greatest extent possible."[9]  At the same time, because restitution is intended to allow crime victims and others who have suffered losses as a result of a defendant's criminal conduct to recover monetary damages that would otherwise be subject to recovery only in a civil suit, we have recognized that a person injured by a defendant's criminal conduct may not recover more than the person could recover in a civil case based on the same conduct.[10]  Indeed, the legislature has declared that a restitution order is "a civil judgment for the

---

[7]  By statute, T.R. — as M.M.'s mother — qualifies as a "victim."  AS 12.-55.185(19)(B) (defining "victim," for purposes of sentencing, as including a parent of the direct victim, if the direct victim is a minor).

[8]  At the time of Grubb's offense, this provision was codified at AS 12.55.100(a)(2).

[9]  *Ned v. State*, 119 P.3d 438, 446 (Alaska App. 2005) (quoting *Lonis v. State*, 998 P.2d 441, 447 n.18 (Alaska App. 2000)); *see also* Alaska Const. art. I, § 24 (providing that crime victims have "the right to restitution from the accused").

[10]  *Ned*, 119 P.3d at 446-47.  We have not previously held that the recovery available in restitution is entirely coextensive with recovery available in tort, nor do we purport to do so here.  For instance, although criminal restitution is *limited* by the damages available in a civil case, in that a victim in a criminal case cannot recover restitution greater than what is available under tort law, a plaintiff in a civil suit may be entitled to additional damages — such as punitive damages — that go beyond the actual loss or damages that would be recoverable as restitution in a criminal case.  *See Noffsinger v. State*, 850 P.2d 647, 650 (Alaska App. 1993) (differentiating criminal restitution from civil liability on several grounds, including that criminal restitution is limited by actual damages and losses).

amount of restitution" that can be enforced "through any procedure authorized by law for the enforcement of a civil judgment."[11]

Accordingly, we employ a test of proximate causation in evaluating restitution claims in criminal cases — the same test for causation used in civil lawsuits.[12] As we explained in *Ned v. State*, "if a defendant's liability for restitution extended to any and all expenses that could be traced causally to the defendant's wrongful act — then the scope of restitution in a criminal case would exceed the scope of damages that could lawfully be awarded in a [civil] lawsuit based on the same conduct."[13]

Thus, in order to obtain a restitution order for particular losses or damages, the State must establish two facets of causation: (1) that a defendant's criminal conduct was a cause-in-fact (a "but for" cause) of the losses incurred, and (2) that the losses were a natural and proximate result of the criminal conduct to which liability should attach — *i.e.*, that the losses were not so attenuated from the wrongful conduct as to negate

---

[11] AS 12.55.045(l); *see also Hodges v. State*, 158 P.3d 864, 865-66 (Alaska App. 2007) (recognizing that restitution is no longer statutorily limited by a defendant's ability to pay and that, in eliminating the court's ability to consider a defendant's ability to pay in setting restitution, "the legislature wanted to carry out the policy of making restitution orders the equivalent of a civil judgement entered against the defendant in favor of the victims").

[12] *See Ned*, 119 P.3d at 446.

[13] *Id.*

responsibility.[14]  Stated differently, the State needed to show that Grubb's criminal conduct was a "substantial factor" in bringing about the damages sought.[15]

Grubb does not contest that his criminal conduct was the cause-in-fact of T.R.'s resignation (and the losses that she incurred as a result).  But, as we noted, it was not enough for the State to show that, but for Grubb's conduct, T.R. would not have resigned from her job or incurred certain future losses.  As we declared in *Ned*, "[S]ome expenses are simply too indirectly related to the wrongful [conduct] to qualify for reimbursement."[16]  Thus, in *Ned*, we held that the travel costs of all family members and friends to attend the victim's funeral — while "real and verifiable" and undoubtedly the "but for" result of the defendant's act of homicide — were not a "sufficiently direct result of the defendant's crime to qualify for restitution."[17]

The question we must confront here is whether Grubb's criminal conduct is the proximate cause of T.R.'s future lost wages and retirement benefits — *i.e.*, whether

---

[14]  *See id.*; *see also Paroline v. United States*, 572 U.S. 434, 446, 449-50 (2014) (recognizing that "[p]roximate cause is a standard aspect of causation in criminal law and the law of torts" and discussing the need for the government to establish both causation-in-fact and proximate causation with respect to a federal restitution statute); *Howarth v. State, Pub. Def. Agency*, 925 P.2d 1330, 1333 (Alaska 1996) (explaining that "legal cause encompasses two concepts" — actual ("but for") causation and causation grounded in legal policy, which asks "whether the conduct has been so significant and important a cause that the defendant should be legally responsible" (internal quotations and citations omitted)).

[15]  *See State v. Malone*, 819 P.2d 34, 36 (Alaska App. 1991) ("A criminal defendant can be held responsible only for injuries that 'result from' or are 'caused by' his conduct. But the defendant's conduct need not be the sole factor in producing the injury. Rather, the test is whether the defendant's conduct was a 'substantial factor' in bringing about the result.").

[16]  *Ned*, 119 P.3d at 446.

[17]  *Id.* at 446-47.

these losses were a reasonably foreseeable consequence of Grubb's criminal conduct, or whether those losses are too attenuated from Grubb's conduct to satisfy the test of legal causation.[18]

We have previously recognized that Alaska law permits victims to recover for income lost as a result of a defendant's criminal conduct.[19] At the same time, we have been more cautious about restitution awards based on estimates of losses projected to occur in the future. For example, although we have recognized the court's authority to award restitution for the costs of future counseling resulting from a defendant's criminal conduct, we have said that there must be evidence in the record "firmly establish[ing]" the need for, and the amount of, such expenses.[20] Here, T.R.'s estimated

_____

[18] *Cf. Johnson v. State*, 224 P.3d 105, 111 (Alaska 2010) ("A defendant is responsible for the natural consequences of his or her act or failure to act. Natural consequences are those reasonably foreseeable in light of ordinary experience. The defendant need not have foreseen the specific manner of resulting harm so long as (1) the general type of harm was foreseeable, and (2) the actual harm falls within the scope of risk hazarded by the defendant's conduct and is not too remote or accidental in occurrence.").

[19] *See, e.g.*, *W.S. v. State*, 174 P.3d 256, 258-59 (Alaska App. 2008) (upholding award of restitution to child victim's aunt — who was the victim's custodian — for the past hours she missed from work to care for the victim following the charged assault); *see also Yannello v. State*, 2014 WL 1691542, at *3 (Alaska App. Apr. 23, 2014) (unpublished) (upholding award of restitution to assault victim for wages he lost while he was physically unable to work and to the victim's parents for the cost of their flight to Alaska to care for him in the immediate aftermath of the assault).

Since the time of Grubb's offense in the summer of 2014, the legislature has amended the restitution statute, AS 12.55.045, to include express references to a victim's lost income. *See* SLA 2015, ch. 17, §§ 1-3. These provisions apply to an order of restitution for an offense committed on or after the effective date of August 9, 2015.

[20] *See Lawrence v. State*, 764 P.2d 318, 322 (Alaska App. 1988) (expressing concern about "the problem of awarding restitution for unliquidated damages which arose from the offense" and expressing the need for the amounts of such losses to be "firmly established");

(continued...)

future wage and benefits are more attenuated from Grubb's criminal conduct, as the losses were occasioned by T.R.'s consequent decision to resign from her teaching position.

The Alaska Supreme Court — applying the same proximate cause standard that we apply to restitution claims — has held that these types of losses, which hinge on a sense of personal obligation that is difficult to quantify, are too uncertain and attenuated from the underlying harm to be compensable in a civil suit.

In *Heritage v. Pioneer Brokerage & Sales, Inc.*, the supreme court considered whether, in a civil lawsuit, a husband could recover wages lost as a result of his decision to provide nursing care to his injured wife after she was exposed to toxic fumes in a mobile home they had purchased.[21] The husband asserted that he had suffered economic losses because he left a lucrative job on the North Slope for a lesser-paying job in Juneau to provide medical and psychological care to his wife, who suffered a variety of medical problems from the fumes.[22] But the supreme court rejected the notion that the plaintiffs were entitled to recovery of the husband's lost wages.

In reaching its conclusion, the court distinguished the circumstances in *Heritage* from its earlier decision in *State v. Stanley*, where the court upheld an award of lost income to a fisherman whose vessel was damaged by the defendant.[23] The court

---

[20] (...continued)
*see also Peratrovich v. State*, 903 P.2d 1071, 1078 (Alaska App. 1995) (recognizing that, under the restitution statute, a defendant may be required to compensate the victim for future counseling expenses, but explaining that restitution for such expenses "must be based on substantial evidence of monetary loss or expense, not mere speculation").

[21] *Heritage v. Pioneer Brokerage & Sales, Inc.*, 604 P.2d 1059, 1060 (Alaska 1979).

[22] *Id.* at 1064.

[23] *Id.* (discussing *State v. Stanley*, 506 P.2d 1284, 1293 (Alaska 1973)).

noted that, unlike the plaintiff in *Stanley*, the husband in *Heritage* was not *directly* prevented from pursuing the more lucrative employment on the North Slope.[24]

Moreover, the court held that "[e]ven if [the husband]'s job change was directly occasioned by the injury to his wife from the defective mobile home, "recovery of his lost wages is foreclosed."[25] In particular, the court held that the economic damages caused by a spouse's decision to switch jobs in order to care for their injured spouse were too attenuated from the underlying harm:

> We are not persuaded that damages based on this . . . theory should be awarded, however, since a determination of when the support of a close family relationship is necessary to the medical and psychological comfort of the injured individual is always an uncertain inquiry, and the extent of such damages attributable to an injury is, in our view, too speculative to be made part of the general recovery of tort victims.[26]

The supreme court reaffirmed this principle more recently in *Glamann v. Kirk*.[27] In *Glamann*, the court held, based on *Heritage*, that the wage losses caused by a wife's decision to transport her husband to his medical appointments after a car accident were not compensable in a lawsuit based on the driver's negligence.[28] In doing so, the court reiterated its previous holding in *Heritage* that "a determination of when

---

[24] *Id.*

[25] *Id.*

[26] *Id.* at 1065. The court also noted its concern about the possibility of "double recovery," recognizing that while an injured plaintiff is entitled to recover the reasonable costs of home nursing care, a family member who elects to provide this care is not also entitled to recover earnings lost as a result of that decision. *Id.* at 1064-65.

[27] *Glamann v. Kirk*, 29 P.3d 255 (Alaska 2001).

[28] *Id.* at 264-65.

support is necessary in a close family relationship is 'too speculative to be made part of the general recovery of tort victims.'"[29]

A majority of courts appear to have reached a similar conclusion. In *Hutchings v. Childress*, for example, the Ohio Supreme Court stated that it was following the majority rule when it rejected a damages claim for income lost by a husband while caring for his wife, the injured plaintiff.[30] The court held that "[d]amages are measured not by the lost income of the supporting spouse but by the market value of the services he or she renders"[31]:

> A spouse's choice to take a break from employment to provide care is only indirectly attributable to a tortfeasor's actions. That choice is caused by a sense of obligation rather than by the accident.[32]

The court characterized the issue as "one of causation and foreseeability": "[A] tortfeasor would expect to pay the market rate for the care provided to the injured party, [but] not the wages of a stockbroker who provided that care."[33] Because the plaintiffs in *Hutchings* had not sought to introduce any evidence of the economic value of the

---

[29] *Id.* at 265 (quoting *Heritage*, 604 P.2d at 1065). The court implicitly rejected the plaintiff's suggestion that his wife's lost wages should be recoverable because they could have been reframed in terms of his own costs for transportation to his medical appointments. *Id.* at 264-65.

[30] *Hutchings v. Childress*, 895 N.E.2d 520 (Ohio 2008) (citing 2 Jacob A. Stein, *Stein on Personal Injury Damages* § 7:11, at 7-30 (3d. ed. 1997)).

[31] *Id.* at 521.

[32] *Id.* at 526.

[33] *Id.*

nursing care the husband provided but framed their request solely in terms of lost wages incurred by the husband in providing that care, the court rejected the wife's claim.[34]

Grubb's case presents the same issue that confronted the *Heritage* and *Hutchings* courts — *i.e.*, whether a defendant can fairly be held liable for wages lost as a result of an individual's decision to resign from work to care for a family member. T.R. resigned from her position as a public school teacher in order to provide emotional support for her son. While T.R.'s decision to resign in order to care for M.M. was certainly understandable, and the trial court reasonably credited T.R.'s testimony that her decision was driven by the substantial impact of Grubb's criminal conduct on M.M., we conclude that T.R.'s decision involved too many indeterminate variables to render the resulting wage and benefit losses recoverable as a matter of law.

For instance, T.R.'s projected wage and benefit losses hinged on a number of factors unconnected to Grubb's conduct — for example, the flexibility of her job, her supervisor's diminished willingness to accommodate her scheduling needs, and her decision to resign rather than take a leave of absence.[35] T.R. acknowledged that her supervisor initially afforded her some flexibility in the mornings by allowing her to drop her first class, but eventually "[t]here was very little support at [her] job . . . for [her] situation," and she felt she "couldn't be there for [M.M.]," her students, and herself.[36] While T.R. no doubt made decisions that she felt best for her and her son, those types of

---

[34]  *Id.*

[35]  According to T.R., her husband told her that they would be secure financially if she left her teaching position. T.R. also testified that she continued to make money from her separate work as a real estate agent.

[36]  T.R. testified that she would only return to teaching if she were offered the right position — a position in which she would both be beneficial to the program and have the flexibility to still address M.M.'s needs.

personal decisions hinge on indeterminate factors and preferences that make assigning legal damages an inherently uncertain task. And the Alaska Supreme Court has made clear that determining the extent of such damages is "too speculative" to be made part of the general recovery of tort victims.[37] We likewise conclude that T.R.'s losses were "too speculative" and attenuated from Grubb's conduct to be made part of restitution.[38]

The difficulty of calculating potential losses far into the future supports this conclusion. While the State argues that T.R. was a tenured teacher four years away from retirement under a defined benefit plan established by statute, such that her future losses were ascertainable, her testimony during the hearing suggests that, even so, she encountered difficulties in estimating her projected future earnings. Other similarly situated parents may be in even less quantifiable situations. And it is not reasonably foreseeable that a defendant would have to bear the costs of diminished pay for a caretaker, particularly when the loss of income is extreme as in the case of a particularly high-paying job. Indeed, the award of restitution in a case might hinge on whether the victim had a relative who was in a position to take an extended leave from work at all.

The State argues that it is foreseeable that an abuse victim's need for extra support and care would result in financial hardship for the family and that a parent

_____

[37] *Heritage v. Pioneer Brokerage & Sales, Inc.*, 604 P.2d 1059, 1065 (Alaska 1979).

[38] Other courts have reached a similar conclusion in the restitution context. *See State v. Baker*, 177 A.3d 1093, 1098, 1103-04 (Vt. 2017) (reversing a restitution award for wages lost by a husband after he left work to travel to the scene of his wife's car accident; the court held that the husband's decision to leave work to deal with the non-immediate repercussions of the defendant's crime was not a reasonably foreseeable consequence of the defendant's negligent vehicle operation); *see also Wiredu v. State*, 112 A.3d 1014, 1024 (Md. App. 2015) (holding that restitution for wages lost by a wife in caring for her husband — the victim of the defendant's assault — was improper under Maryland statute and declining State's request on appeal to reframe restitution request for lost wages as medical expenses incurred while wife was caring for her husband).

leaving their job to care for their child is not highly extraordinary. But ultimately, while T.R. made an understandable decision to leave her job, she acknowledged that this decision was voluntary, and our law does not allow for compensation for lost financial benefits under these circumstances.

We therefore reverse that portion of the restitution order attributable to T.R.'s future lost wages and retirement benefits resulting from her resignation. Because T.R.'s future lost salary and benefits were not compensable under Alaska law, we need not reach Grubb's other challenges to the award of these costs — including that the award violates the constitutional prohibition on excessive fines, and that T.R. had a legal duty to mitigate her losses if she wished to recover for them.

*Conclusion*

We VACATE the restitution judgment and REMAND to the superior court to enter a revised restitution judgment consistent with this decision. Those portions of the restitution order that Grubb did not contest remain in place.